In re LAFAYETTE RADIO ELECTRONICS CORP., Debtor.

Bankruptcy No. 880–00042–18.

United States Bankruptcy Court,
E. D. New York.

June 23, 1981.

Levin & Weintraub, New York City, for debtor.

David Abrams, Monroeville, Pa., for landlord.

C. ALBERT PARENTE, Bankruptcy Judge.

Lafayette Radio Electronics Corporation (hereinafter "debtor") filed an order to show cause on July 24, 1980, seeking permission pursuant to 11 U.S.C. § 365(a) to assume a real estate lease (hereinafter "prime lease") entered into with Jonnet Development Corporation (hereinafter "landlord"), and to sublease the premises to Roaman's Stores of Pennsylvania, Inc. (hereinafter "Roaman's").

A hearing on said order to show cause was commenced on August 5, 1980, at which time the landlord moved to dismiss for improper venue pursuant to 28 U.S.C. § 1473(d). A decision was rendered by this Court on August 11, 1980, denying said motion.

On August 25, 1980, the landlord demanded a jury trial. The Court rendered a decision denying the landlord's motion on November 5, 1980. 7 B.R. 187.

Subsequently, the landlord changed the locks on the leasehold premises in violation of the automatic stay provisions of § 362 of the Bankruptcy Code. The landlord was found in contempt of this Court, and the Court levied a fine on the landlord for failure to turnover to the debtor a key to the new lock. The order of contempt is presently on appeal to the District Court for the Eastern District of New York.

The landlord timely filed an answer' in opposition to the debtor's order to show cause, intromitting the following affirmative defenses: (1) improper venue; (2) failure to join an indispensable party; to wit, the Municipality of Monroeville, Pennsylvania; (3) that as a result of certain post-petition defaults the debtor has no standing to move to assume the prime lease; (4) that the agreement between the debtor and Roaman's is an assignment, not a sublease, and must therefore comply with certain provisions of the prime lease; and (5) failure to provide adequate assurance of future performance pursuant to § 365(b)(1) and (3) of the Bankruptcy Code.

The hearing was concluded February 25, 1981.

The Court makes the following findings of fact:

(1) Debtor entered into the prime lease with Jonnell Enterprises, Inc. on March 21, 1967, for the premises in the Monroe Plaza Shopping Center, Monroeville, Pennsylvania, known as Lafayette Location Number 28. The term of the prime lease is ten years with two options to renew for an additional five years each.

(2) In late 1968, the interests in the prime lease of Jonnell Enterprises, Inc. were assigned to the landlord (Jonnet).

(3) On January 4, 1980, the debtor filed a voluntary petition in bankruptcy under Chapter 11 of the Bankruptcy Code.

(4) Prior to the filing of the petition in bankruptcy, the debtor was current in all of its obligations under the prime lease. Since the filing, the debtor has defaulted in its rent payments for the months of November and December 1980, and January 1981. Robert Crimmins, Director of Real Estate for the debtor, testified that he has in his possession checks to cover the rent arrears.

(5) Crimmins testified that the debtor had failed to pay a real estate tax escalation for 1980 due to the fact that the debtor was never billed for said tax.

(6) The roof over the leasehold premises leaks when it rains, which has resulted in extensive damage to the premises, including the floor, walls and electrical system. Repairs are estimated at approximately $38,000. The cause of the damage to the roof is in dispute.

(7) In furtherance of its efforts to reorganize, the debtor commenced a program of subleasing those retail outlets which had been closed, at rentals in excess of the lease rentals set forth in the prime leases between the various landlords and the debtor.

(8) At present, the debtor's sublease program is generating an annual income stream of $650,000. Crimmins testified that upon completion of the sublease program, the debtor expects the annual income generated to be approximately $900,000.

(9) As part of the sublease program, the debtor commenced this action seeking the Court's permission to assume the prime lease, and to sublease the premises to Roaman's. Predicated upon the sublease agreement, the debtor will realize a net income of at least $19,652 per year, the difference between the debtor's rent obligation under the prime lease and Roaman's obligation under the sublease. The total income to the debtor over the full term of the sublease will be in excess of $130,000.

(10) Roaman's Stores, Inc., a parent company of the sublessee, is the guarantor of the sublease. The guarantor oversees Roaman's operation of about a dozen stores in Pennsylvania, as well as similar operations in other states. The net worth of the guarantor is approximately $2.1 million.

(11) Roaman's intends to operate a retail clothing store known as Sizes Unlimited in the leasehold premises. Said store specializes in large size women's wear.

(12) Monroe Plaza Shopping Center is a "strip" center, not an enclosed mall. There are approximately twenty stores in the center, including three clothing stores. Of the three, Arturn offers a full line of women's clothing and children's clothes; the second store sells primarily women's sportswear and jeans; and the third is a large retail clothing store, selling a complete line of men's and women's clothing.

(13) Arturn has an exclusivity clause in its lease with the landlord, purportedly prohibiting any new retail clothing stores from doing business in the shopping center during the term of the Arturn lease.

Based on the foregoing findings of fact, the following issues are before the Court:

(1) Should the debtor's order to show cause be dismissed or transferred to the United States Bankruptcy Court for the Western District of Pennsylvania due to improper venue;

(2) Should the debtor's order to show cause be dismissed for failure to join an indispensable party;

(3) Has the debtor provided the requisite probative measure of adequate assurances pursuant to § 365(b) permitting it to assume the prime lease; and

(4) Is the proposed sublease in the best interests of the debtor and its creditors?

## I.

Landlord's answer sets forth as an affirmative defense that debtor's:

application violates the provisions of 28 U.S.C. § 1473(d) as respects the jurisdictional and venue requirements therein specified,

and further states that debtor's:

application has not been properly served upon [landlord] as a consequence of the filing mandates of 28 U.S.C. § 1473(d) as the same must be commenced in the State Courts of Pennsylvania, namely the location of the leasehold or the Federal District Court for the Western District of Pennsylvania, and served according to the Bankruptcy Rules or Rules of Federal Civil Procedure adopted in said location.

28 U.S.C. § 1473(d) provides, in relevant part, that a debtor in possession may "commence a proceeding arising under title 11 . . . only in the bankruptcy court for the district where a State or Federal court sits in which, under applicable nonbankruptcy venue provisions, an action on such claim may have been brought."

Despite landlord's characterization of this section as jurisdictional, it is clear from the language of the section that it is connected with venue and not jurisdiction. *In re G. Weeks Securities, Inc.*, 2 C.B.C.2d 1240 (W.D.Tenn.1980).

■ Pursuant to the Federal Rules of Civil Procedure, as made applicable by the Bankruptcy Rules of Procedure, a party may move to dismiss a proceeding on the ground of improper venue, or may preserve the issue in his answer. Fed.R.Civ.Pro. 12(b), (h). However, where, as in the case at bar, the Court denies the Rule 12(b) motion to dismiss due to improper venue, a party cannot prolong the issue by raising it again in his answer. *Randolph Engineering Co. v. Fredenhagen Kommandit-Gesellschaft*, 476 F.Supp. 1355 (W.D.Pa.1979); *Guenther v. Morehead*, 272 F.Supp. 721 (S.D.Iowa 1967).

■ Assuming, *arguendo*, that the issue of improper venue was preserved in the landlord's answer, the landlord has waived any challenge to venue by failing to renew his motion to dismiss.

The original motion to dismiss was made on August 5, 1980, and denied by decision rendered August 11, 1980. The landlord has not filed a *de novo* motion to dismiss.

At this late date, after several hearings have been held, the Court, on the eve of rendering a decision on the merits of the proceeding, finds no equitable basis or legal impetus to dismiss or transfer the entire action predicated upon improper venue. *Commercial Casualty Ins. Co. v. Consolidated Stone Co.*, 278 U.S. 177, 49 S.Ct. 98, 73 L.Ed. 252 (1929).

## II.

With respect to the debtor's failure to join an indispensable party, the landlord's answer raises as an affirmative defense that the debtor:

has failed to join the Municipality of Monroeville as an indispensable party to this litigation as a consequence of the relief requested and the allegations contained in this Answer indicating that to

[landlord's] belief, the occupancy permits granted by said Municipality of Monroeville to [debtor] for operation of the leasehold premises [have] been revoked and/or vacated as a consequence of [debtor's] default under the lease.

Landlord did not raise the issue of joinder in its motion to dismiss. However, Federal Rule of Civil Procedure 12(h)(2), as adopted by Bankruptcy Rule of Procedure 712, provides that "... a defense of failure to join a party indispensable under [Federal Rule of Civil Procedure] 19 ... may be made in any pleading or ordered under [Federal Rules of Civil Procedure] 7(a) ... or at the trial on the merits."

■ Therefore, the landlord preserved his defense of failure to join an indispensable party by including said defense in his answer. The fact that the landlord never made a subsequent motion to dismiss for failure to join an indispensable party does not constitute a waiver of that defense. *Capitol Records v. Mercury Record Corp.*, 109 F.Supp. 330, 334 (S.D.N.Y.1952) (Failure to join an indispensable party is properly before the Court even though raised for the first time in the post-trial memorandum), *aff'd*, 221 F.2d 657 (2d Cir. 1955).

Rule 719 of the Bankruptcy Rules of Procedure provides, in relevant part, that "A person who is subject to service of process shall be joined as a party in the proceeding if (1) in his absence complete relief cannot be accorded among those already parties . . . ."

■ In the case at bar, as a result of the leaking roof and subsequent water damage to the leasehold premises, the Fire Marshall of the Municipality of Monroeville revoked the occupancy permits for said premises. The only interest which has been alleged on the part of the Fire Marshall is that the premises be repaired before the occupancy permits will be restored.

As will be discussed more fully below (Part III), the landlord has a duty under the prime lease to repair the damage caused by the leaking roof. This affirmative duty to promptly repair the leasehold premises will

satisfy the interests of the Municipality of Monroeville. Therefore, the Court finds that the Municipality of Monroeville is not an indispensable party within the contemplation of Rule 719, as complete relief may be afforded to the parties to the instant action without the joinder of said Municipality. *See e. g., Long v. Levinson*, 374 F.Supp. 615 (S.D.Iowa 1974).

### III.

The next issue which must be resolved is whether or not the debtor has met his burden of proof by offering adequate assurances pursuant to § 365(b), such that this Court should permit the debtor to assume the prime lease.

■ As previously noted, "If the court determines that assumption would substantially further the debtor's reorganization effort and that the rights of other parties to the contract or lease are receiving their due recognition and protection, the court is obliged to grant the necessary approval." *In re Lafayette Radio Electronics Corp.*, 7 B.R. 189, 191 (E.D.N.Y.1980) (hereinafter cited as *"Lafayette I"*).

■ In order for the Court to make this determination, the debtor must comply with the test set forth in § 365(b)(1):

If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of the assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

The landlord alleges three defaults by the debtor with respect to § 365(b)(1)(A); to wit, failure to pay rent obligations incurred for the months of November, December 1980 and January 1981; failure to pay a real estate tax escalation; and failure to repair damages resulting from leaks in the roof of the leasehold premises.

As all three of these defaults occurred after the filing of the Chapter 11 petition, the landlord sets forth as an affirmative defense that the debtor has no standing to move to assume the prime lease. The clear language of § 365(b)(1)(A) states "If there has been a default . . ." without any differentiation between pre-petition and post-petition defaults. The landlord does not cite any authority for his novel reading of this section. Therefore, the Court finds that the debtor does have standing to move to assume the prime lease.

With respect to the default in the payment of the rent, Crimmins testified that the debtor is prepared to cure all rent defaults. The landlord did not controvert this testimony.

Crimmins admitted that the debtor did not pay any real estate tax escalation for 1980, and concedes that the payment of said tax escalation is the duty of the debtor under the terms of the prime lease. However, the debtor contends that the duty does not arise until the debtor is billed by the landlord for the tax escalation.

Neither party introduced evidence as to whether past tax escalations have been paid by the debtor before or after billing.

Rider 44 to the prime lease provides, in relevant part:

If the Tenant's share of the real estate taxes upon the Shopping Center for any tax year commencing after the base year shall exceed Tenant's share of the real estate tax upon the Shopping Center for the base year, Tenant will pay the amount of such excess to Landlord as additional *rent*. (Emphasis added).

Paragraph three of the prime lease states, in part, that the "Landlord agrees to submit monthly bills for the *rent* to the Tenant." (Emphasis added). As Rider 44 provides that the tax escalation is addition-

al rent, the Court finds that no duty exists for the debtor to pay said tax escalation until the debtor is billed pursuant to paragraph three of the prime lease. Therefore, the Court holds that, although the debtor breached the lease in not paying the tax escalation, failure of the landlord to give proper notice of the money owing prevents that breach from becoming a default. *See Lafayette I, supra* at 192–93.

The third default alleged by the landlord is the failure of the debtor to repair damage to the leasehold premises caused by leaks in the roof.

Since the landlord is contending that the debtor has not cured this default, nor provided adequate assurance that the default will be promptly cured, the landlord has the burden of proving the existence of the default. The Court finds that the landlord has failed to meet this burden.

Joseph Jonnet, an officer of the landlord, testified that on several occasions he had observed mechanics and agents of the debtor on the roof of the premises, working on the antennas and air conditioning units. Elmer Jonnet, another officer of the landlord, testified that he observed the manager of the debtor's store running across the roof of the premises with several other people. Afterward, he found holes in the roof and tools which, in his opinion, could have been used to cause these holes.

Assuming, *arguendo*, that agents for the debtor were on the roof, there is no evidence to indicate that the tools were owned or used by these agents. Thus, the landlord has failed to establish probatively that the debtor willfully caused any damage to the roof.

This is particularly true in the instant case in light of the testimony of Robert Mitchell, a roofing contractor who examined the roof on behalf of Roaman's. Mitchell testified that, in his opinion, the damage to the roof was caused by normal wear and tear, and that he had not seen any indication that the damage was the result of willful or negligent acts.

Paragraph nine of the prime lease provides, in relevant part, that:

in no event shall the Tenant be required to make any repairs ... which may be necessary as a result of damage or destruction by fire, the elements or casualty, by reason of any structural default or failure ... except that Tenant and not Landlord shall be exclusively liable therefor to the extent that Tenant is covered by insurance therefor.

Pursuant to this clause, and based upon a finding that the damage to the roof was the result of normal wear and tear, the Court holds that the landlord is responsible for making repairs to the roof and the premises for all damages caused by the leaking roof, to the extent that such repairs are not covered by the debtor's insurance.

Therefore, the Court concludes that the debtor is not in default with respect to repairing the roof or the resulting damages to the premises.

As the landlord has not alleged any pecuniary loss arising out of the aforementioned rent default, § 365(b)(1)(B) does not apply in the instant case.

## IV.

### A.

The final requirement of § 365(b)(1) is that the debtor provide adequate assurance of future performance under the prime lease.

Both parties agree that the leasehold premises is located in a shopping center. Therefore, the special considerations of § 365(b)(3) must be complied with if adequate assurance is to be given.

Section 365(b)(3) provides that:

... adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance—

(A) of the source of rent and other consideration due under such lease;

(B) that any percentage rent due under such lease will not decline substantially;

(C) that assumption or assignment of such lease will not breach substantially

any provision, such as a radius, location, use, or exclusivity provision, in any other lease, financing agreement, or master agreement relating to such shopping center; and

(D) that assumption or assignment of such lease will not disrupt substantially any tenant mix or balance in such shopping center.

■ The landlord contends that the lease arrangement between the debtor and Roaman's is an assignment, while the debtor alleges that said arrangement is a sublease. At issue is whether the debtor or Roaman's is to be the primary focus of the Court's inquiry into adequate assurance of future source of rent payments to the landlord. *In re Lafayette Radio Electronics Corp.*, 9 B.R. 993 (E.D.N.Y.1981) (hereinafter cited as *"Lafayette II"*).

Case law in Pennsylvania clearly holds that "where the lessee of land transfers all of his interest therein, it is an assignment, and not a sublease thereof. A lease or a sublease must, in legal contemplation, leave in the lessor or sublessor some estate in reversion." *In re Bayley*, 177 F. 522, 524 (W.D.Pa.1909); *Morrisville Shopping Center v. Sun Ray Drug Co.*, 381 Pa. 576, 112 A.2d 183 (1955); *Ottman v. Albert Co.*, 327 Pa. 49, 192 A. 897 (1937).

■ The intention of the parties in making the lease arrangement is not controlling, as "it is a cardinal rule in the construction of papers that it is the paper itself which determines its character, and not what the parties may have chosen to designate as its character." *Bayley, supra* at 524.

The debtor alleges two reversions which make the lease arrangement between it and Roaman's a sublease. The first is that the debtor will receive approximately $2,793 per month from Roaman's, while it will pay a rent of only $1,041.67 per month to the landlord under the prime lease.

However, the Supreme Court of Pennsylvania has stated that a reversion in rent is insufficient of itself to support a finding that a sublease exists. *Morrisville Shop-*

*ping Center, supra* 381 Pa. 576, 112 A.2d at 187–88. *See also Thomas v. U.S.*, 505 F.2d 1282 (Ct.Cl.1974).

The second reversion alleged by the debtor is that the sublease terminates one day prior to the termination of the prime lease.

Rider A to the prime lease provides that: Landlord shall give Tenant at least 30 days written notice of the date upon which the demised premises shall be ready for initial occupancy by the Tenant, and shall deliver the said premises for such occupancy to the Tenant on such date. The term of this lease shall commence on such date and shall terminate on a date ten years thereafter unless sooner terminated as provided in this lease. Landlord agrees to deliver said premises to Tenant pursuant to forgoing (sic) provisions not later than October 1, 1967.

The debtor contends that the premises were not turned over to it until November 15, 1967. Thus, the debtor asserts that upon proper exercise of the two options to renew, the prime lease terminates on November 15, 1987. As the sublease terminates on November 14, 1987, the debtor alleges that a reversion has been retained.

The landlord asserts that, as Rider A uses the date of October 1, 1967, as the last day on which the landlord could deliver the premises, October 1, 1967, is the starting date for the prime lease. Therefore, the landlord asserts that the debtor has not retained a reversionary interest in the prime lease.

Crimmins testified that he has in his possession a document which was signed by the landlord, agreeing that the starting date of the prime lease was November 15, 1967. The landlord disputed the interpretation placed on said document by Crimmins. Neither party introduced said document into evidence.

The landlord indicated that the debtor moved into the premises on October 1, 1967, but that "certain things that had to be done" were not finished until after that date.

Although the starting date of the prime lease was the subject of a state court action in Pennsylvania, as well as subsequent arbitration proceedings, neither party introduced the results of these actions into evidence.

The debtor did, however, read from a part of the decision rendered by the Court of Common Pleas of Allegheny County in the aforementioned state court action. In that decision, Judge Hester stated, in part, that "Defendant-lessor agreed to deliver the demised premises to the Plaintiff not later than October 1, 1967. He was unable to deliver that premises by the aforementioned date, but did by November 15, 1967."

Although the Court would prefer that the entire decision by Judge Hester were before it in evidence, based on that portion of the decision cited above, the Court finds that the debtor has sustained his burden of proof that the starting date of the prime lease was November 15, 1967.

Predicated upon the above finding and the failure of the landlord to introduce the entire decision rendered by Judge Hester to support its position, or to allege that the above cite was taken out of context, this Court is constrained to find that the prime lease began on November 15, 1967. Thus, the prime lease will terminate on November 15, 1987, and the debtor has retained a reversionary interest in the prime lease of one day.

In light of this reversion, particularly when taken in conjunction with the reversion in rent, the Court holds that the lease arrangement between the debtor and Roaman's is a sublease.

Based upon the finding that the lease arrangement is a sublease, the primary focus of the inquiry into the adequate assurance of a source of rent and other consideration pursuant to § 365(b)(3)(A) is on the debtor.

Three assurances have been offered by the debtor as proof that it can meet its financial obligations under the prime lease. First, that the income stream generated by the sublease program is sufficient to satisfy the rent obligations under the prime lease. Second, the proposed merger between the debtor and Wards Company, Inc. Third, the viability of Roaman's.

This Court has, in two previous proceedings, held that the stream of income generated by the sublease program, and the proposed merger with Wards, form sufficient adequate assurance of future performance by the debtor. *Lafayette I, supra; Lafayette II, supra.*

The testimony adduced at the hearing revealed that Roaman's is currently operating about a dozen stores in Pennsylvania similar to the one which they proposed to open in the leasehold premises. In addition, the sublease provides for a guarantor, Roaman's Stores, Inc., which has a net worth of approximately $2.1 million.

The landlord did not controvert this evidence. Furthermore, the landlord introduced no evidence of its own to suggest that Roaman's or its guarantor might have any financial difficulties in the future, based on their present operations.

Therefore, the Court finds that adequate assurance of future performance has been provided, in compliance with § 365(b)(3)(A).

There is no provision in either the prime lease or the sublease for percentage rent. Thus, § 365(b)(3)(B) does not apply to the case at bar.

### B.

The landlord contends that an exclusivity clause in the lease of one of the clothing stores currently operating in the shopping center, Arturn, prohibits a store of the type proposed by Roaman's from moving into the shopping center. Said exclusivity clause provides, in full, that "The Tenant [Arturn] is hereby guaranteed that no other stores other than existing stores shall be permitted to engage in retail clothing and related items sales in the Shopping Center for the duration of this lease agreement." Said lease agreement is in operation until April 15, 1985.

The debtor alleges, and the Court so finds, that the landlord has waived his right

to seek enforcement of the exclusivity clause against the debtor.

■ Under Pennsylvania law, the question of whether or not a restrictive covenant will be enforced is grounded in equity. *Cranes-Mayos Clothes, Inc. v. Street Road Shopping Center, Inc.*, 50 D.&C.2d 734 (C.P. Bucks 1970).

■ The doctrine of equitable estoppel states that "the complaining party is barred from changing his position to the detriment or prejudice to the other party." *Santa Corp. v. DiPaolo*, 9 D.&C.3d 84 (C.P.Phila. 1978).

■ As developed in Pennsylvania, the elements which must be established to support a finding of equitable estoppel are (1) silence by the complaining party in the face of a duty to speak; (2) lack of knowledge and a means of knowledge of the truth by the party seeking estoppel; (3) reliance upon the silence; and (4) detriment. *Brown v. Haight*, 435 Pa. 12, 255 A.2d 508 (1969); *GAF Corp. v. Amchem Products, Inc.*, 399 F.Supp. 647 (E.D.Pa. 1975), *rev'd on other grounds*, 570 F.2d 457 (3d Cir., 1978).

■ In the case at bar, the debtor introduced into evidence a letter requesting notice from the landlord of any exclusivity clauses which had been granted to other tenants in the shopping center. Said letter was dated April 10, 1980. A return receipt, signed by one Laurie Sproul for the landlord on April 14, 1980, was also introduced into evidence.

According to undisputed testimony adduced at the hearing, the landlord never responded to said letter. Thus, the debtor was not made aware of the existence of the exclusivity clause until the hearing on February 5, 1981, and was not provided with a copy of said clause until the subsequent hearing on February 25, 1981.

Paragraph 5(c) of the prime lease provides, in relevant part, that "Landlord will, upon receiving request therefore from the Tenant, supply Tenant with *reasonable promptness* with a then current list of all restrictions granted to other tenants in the Shopping Center." (Emphasis added).

Clearly, the debtor has met his burden of proof with respect to equitable estoppel. The landlord, despite his affirmative duty to respond to the debtor's inquiry, remained silent for ten months. Furthermore, this silence was maintained throughout six months of this proceeding, until the purported existence of the exclusivity clause was first announced at the February 5, 1981, hearing. Even then, the landlord failed to provide the debtor with a copy of the Arturn lease until the beginning of the subsequent hearing on February 25.

The debtor complied with its duties under the prime lease by its written inquiry to the landlord, and had every right to rely, as it did, on the landlord's silence to proceed with the negotiations with Roaman's for a sublease.

The costs incurred by the debtor and Roaman's in pursuing the sublease in this action constitute a detriment to the debtor and to Roaman's which would not have occurred but for the silence of the landlord. This is true not only on the financial costs to the debtor, but also as to the cost of the lost opportunity to make arrangements with a different sublessee.

Predicated upon the landlord's failure to provide prompt notice of the existence of the exclusivity clause, and in reliance upon the laws of Pennsylvania as cited above, the Court finds that the landlord is equitably estopped from seeking to enforce the exclusivity clause in the Arturn lease against either the debtor or Roaman's, with respect to the sublease in the case at bar.

### C.

■ The final consideration which must be made in determining whether or not adequate assurance has been provided pursuant to § 365(b)(1) and (3) is that the tenant mix or balance of the shopping center will not be substantially disrupted by the presence of Roaman's in the leasehold premises.

The Court has found no cases which have directly considered the question of tenant mix as set forth in § 365(b)(3)(D).

The legislative history with respect to § 365(b)(3) in general states that:

A shopping center is often a carefully planned enterprise, and though it consists of numerous individual tenants, the center is planned as a single unit, often subject to a master lease or financing agreement. Under these agreements, the tenant mix in the shopping center may be as important to the lessor as the actual promised rental payments, because certain mixes will attract higher patronage of the stores in the center, and thus a higher rental for the landlord from those stores that are subject to a percentage of gross receipts rental agreement. Thus, in order to assure a landlord of his bargained for exchange, the court would have to consider such factors as the nature of the business to be conducted by the trustee or his assignee, whether that business complies with the requirements of any master agreement, whether the kind of business will generate gross sales in an amount such that the percentage rent specified in the lease is substantially the same as that would have been provided by the debtor, and whether the business proposed to be conducted would result in a breach of other clauses in master agreements relating, for example, to tenant mix and location.

House Report No. 95–595, 95 Cong., 1st Sess. (1977) 348–49, U.S. Code Cong. & Admin. News 1978, 5963, 6305.

No evidence of any master agreement or percentage rent arrangement was introduced in the case at bar. Nor was any suggestion made that a master plan exists for the shopping center in question which would have a bearing on the issue of tenant mix.

However, the Court recognizes that the level of competition between stores is an important factor which must be considered in the instant inquiry. The success or failure of the individual tenants as a result of a change in the tenancy of the leasehold premises will not only affect the other tenants of the shopping center, but also the amount of rent which the landlord will be able to charge in the future.

The Court concludes that the issue of tenant mix is a question of fact which must be resolved on a case by case basis. The primary consideration before the Court is to balance the interests of the landlord and the current tenants in maintaining a competitive level of business, as well as offering a diversity of merchandise, against the interests of the debtor and sublessee in using the leasehold premises to operate a business.

The Court finds that the burden of proof is on the debtor to provide adequate assurances that the tenant mix will not be substantially disrupted by the presence of Roaman's in the shopping center.

The debtor contends that Sizes Unlimited, the store to be operated by Roaman's in the shopping center, offers clothing which is not sold by the other tenants of the center. Louis Rich, executive vice-president and chief financial officer of Roaman's Inc., the parent corporation of the sublessee, Roaman's, testified that Sizes Unlimited has a special clientele, large women. He further testified that, while a large retail department store would carry clothing for large women, stores selling only women's clothing usually do not sell the large sizes offered by the Roaman's store.

Rich stated that he had gone "carefully through every store that might represent some competitive position, and this particular center, Monroe Plaza, there isn't a single store that has a significant—I would say to the most extent they hardly have any degree of merchandise in our particular fashion specialty."

In juxtaposition to this opinion, Elmer Jonnet testified for the landlord that, with the inclusion of Sizes Unlimited, the footage in the shopping center devoted to retail clothing stores would increase from 35,000 to 40,000 square feet, out of a total footage for the entire center of 110,000.

However, the landlord failed to controvert Rich's testimony that the present clothing stores do not offer the same general merchandise as that sold by Sizes Unlimited.

The Court recognizes that a significant portion of this shopping center will be used for retail clothing stores if the debtor is permitted to assume the prime lease and sublease the premises to Roaman's. The Court is also cognizant of the fact that, as long as the clothing stores offer different types of merchandise and cater to different clientele, the tenant mix will remain balanced. The level of competition within the shopping center will not be unduly burdensome to any of the current stores through direct competition with Sizes Unlimited.

It must be stressed that, while the exclusivity clause has been found to have been waived by the landlord, the fact that one of the existing clothing stores felt it necessary to attempt to prohibit new clothing stores is an important factor which the Court has not overlooked in its examination of the tenant mix.

However, as the foregoing inquiry exhibits, the landlord has failed to offer any evidence to dispute the testimony of Rich that the holder of the exclusivity clause, Arturn, will not be directly affected by the presence of Sizes Unlimited in the Monroe Plaza Shopping Center. It is evidentiary significant that no representative of Arturn appeared or sought to testify on the exclusivity or tenant mix issues before the Court.

Therefore, the Court finds that the debtor has provided adequate assurance that the tenant mix will not be substantially disrupted if Roaman's subleases the premises.

Predicated upon the foregoing analysis, the Court holds that the debtor has complied with § 365(b)(1)(C) and (b)(3) by providing adequate assurances of future performance under the prime lease.

## V.

■ The final issue before the Court in the instant case is whether or not the proposed sublease with Roaman's should be approved. This Court has previously stated that the issue of approval of a sublease turns on whether or not the sublease is in the best interests of the creditors and the estate. *Lafayette II, supra.*

Crimmins testified that this sublease will give the debtor a net income in excess of $130,000 over the term of the sublease.

On two previous occasions, the Court has held that the proposed merger between the debtor and Wards Company, Inc. is "a vital step toward the debtor proffering a plan of arrangement to its creditors." *Lafayette I, supra; Lafayette II, supra.* This Court has also previously noted that there is a condition precedent to the proposed merger, requiring that the income stream from the debtor's sublease program reach $825,000 annually, *Lafayette II, supra.* Thus, the sublease with Roaman's is a significant factor in the debtor's attempt to offer a plan for confirmation.

The Court finds that the proposed sublease is in the best interests of the creditors and estate, and should be approved.

### CONCLUSION

Premised upon the foregoing findings of fact and conclusions of law, the Court holds that: (1) the debtor has provided the adequate assurances necessary pursuant to § 365(b)(1) and (3) and is, therefore, permitted to assume the prime lease; (2) the landlord's affirmative defenses are hereby dismissed, as the landlord has failed to sustain its burden of proof with respect to said defenses; (3) the landlord has a duty under the terms of the prime lease to promptly repair the roof and all resulting damages to the leasehold premises; (4) the agreement between the debtor and Roaman's is a sublease; and (5) the proposed sublease is in the best interests of the creditors and estate, and is hereby approved.

SETTLE ORDER.