In the Matter of **FEDERATED DEPART-MENT STORES, INC., Allied Stores Corporation, et al., Debtors.**

**Bankruptcy No. 1–90–00130.**

United States Bankruptcy Court,
S.D. Ohio.

Dec. 3, 1991.

Cory Lipoff, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for petitioner.

Kevin Abel, Bryan, Cave, McPhecters & McRoberts, St. Louis, Mo., Penn Ayers Butler, Murphy, Weir & Butler, San Francisco, Cal., for respondent.

1. Allied Stores General Real Estate Company ("ASGREC") is the lessee under the Jordan

## OPINION AND ORDER

(Re: Motion to Assign Dadeland Lease)

J. VINCENT AUG, JR., Bankruptcy Judge.

The Equitable Life Assurance Society of the United States ("Equitable") objects to the Motion of Debtors for authority to Assume and Assign Certain Related Agreements to Mervyn's and J.C. Penney Company, Inc. (Docs. 4960, 5054).

First to introduce the interested parties:

Equitable is the owner and manager of a shopping mall in Miami, Florida called Dadeland. It is considered one of the "crown jewels" of Equitable's real estate portfolio and is one of the most profitable and valuable shopping malls in the United States.

Debtors[1] seek to assign the Jordan Marsh lease at Dadeland Mall. Under the lease, Debtors lease a three-story, 210,000 square foot Jordan Marsh store at Dadeland. The Jordan Marsh Store has been operated at Dadeland for over 25 years as a traditional,. full-line, fashion-oriented, retail department store featuring moderately priced to expensive merchandise. Jordan Marsh sells designer clothing and fragrances, fine china and silver, cameras and electronics, fine furniture and floor coverings, and a wide range of other products typically available in other full-line department stores. Jordan Marsh also has a bride's department and bridal registry.

Mervyn's is the proposed assignee of the lease at Dadeland. Mervyn's is a newcomer to the retail market in Florida. In its other markets, Mervyn's typically operates an 80,000 square foot "specialty" department store where it sells casual wear for the cost-conscious consumer. Mervyn's fills a niche in the market just above an upscale discounter and below a traditional department store.

## PROCEDURAL HISTORY IN THE BANKRUPTCY PROCEEDINGS

Earlier in this case, Debtors assumed a modified lease for the Jordan Marsh store

Marsh lease sought to be assigned to Mervyn's in this case.

at Dadeland (*see,* Docs. 904, 1131). At that time Equitable paid Debtors $700,000. Debtors argue that the $700,000 payment was consideration for numerous other obligations concomitant with the assumption and not for the assumption alone. Equitable, however, was obviously caught by surprise when approximately one year later Debtors closed the Jordan Marsh store and sought to assign the lease. That store closing was part of Debtors' overall Florida Strategy which involved closing, consolidating and selling numerous properties in the Southeastern United States which were dominated by the Burdines, Jordan Marsh and Maas store chains.

The Florida Strategy was approved by the Court on April 11, 1991 (*see,* Doc. 4135), and, of course, rights of shopping center owners under 11 U.S.C. § 365 were reserved along with many other rights of parties affected by the Florida Strategy.

The Debtor commenced to market Florida properties and solicit bids on groups of stores. Interested bidders explored the possibilities of forming consortia to bid on these package deals.

Eventually, the Dadeland Mall became part of a package of 8 stores which was the subject of a spirited auction bidding process in open court on August 6, 1991. The parties involved in the bidding involving Dillard's, the Edward J. DeBartolo Corporation, J.C. Penney Company, Equitable, Mervyn's and perhaps others in various alignments and alliances. Mervyn's came through with the winning bid of $80 million.[2] Eventually Mervyn's closed seven out of eight of these deals with only the Dadeland lease remaining mired in this litigation over Equitable's objection.

The hearing on Equitable's objection was held subsequent to the auction. At that hearing, this Court was very leery of the prospect of upsetting the entire auction sale, and indeed pressed Equitable to justify its presence in this proceeding when it did not participate in the auction to any significant degree.

Equitable argued that it felt comfortable resting on its filed objection under the protections afforded by § 365 and likened its participation in the auction to "bidding against itself." Also, Equitable would have been pleased if any of the bidders *except* Mervyn's had won the bidding.

Indeed, Equitable had vigorously tried to protect its position having once tried and failed to buy the lease from Debtors for $14 million. Equitable also failed in an attempt to coax Mervyn's to another location in a Dadeland expansion area where Equitable thought Mervyn's would be suitable for, or at least do no harm to, the upscale image of certain Dadeland tenants such as Saks Fifth Avenue (located near Jordan Marsh).

In any event Mervyn's has closed the other seven deals and this dispute no longer threatens to undo the entire auction. This Court finds that although (with 20/20 hindsight) Equitable's strategy was extremely risky, its decisions were made without any purpose to undermine the auction process and were backed by timely objection and a thoroughly colorable legal stance.

And so, as this controversy rumbled toward trial, the peculiar procedural posture of the case, the prior negotiations between the parties over Dadeland, and the long history of dealings between the parties in numerous other transactions, gave a far different cast to this dispute than is found in routine § 365(b)(3) proceedings.

The Court found it necessary to narrow the issues and focus on the heart of the dispute in the following manner.

First, given the extensive prior dealings between Equitable and Mervyn's in shopping center transactions, it did not make sense for this Court to entertain a challenge by Equitable to the underlying ability of Mervyn's to pay the rent and abide by financial covenants as required by § 365(b)(3)(A). Mervyn's is a chain of 233 stores (approximately one-half are anchor

---

**2.** Of this price, the Debtors and Mervyn's have agreed to allocate $18 million as the value of the

Dadeland lease. See, Doc. 5861).

stores in malls) with a net worth in the range of $700 million. For Equitable to portray Mervyn's as a little leaguer would have been an insult to both Mervyn's and the Court. (*See*, Pierandri Deposition Tr. 76–77). Further, Mervyn's had guaranteed Equitable that it would at least match the level of percentage rent paid by Jordan Marsh.

The Court thus ruled that Equitable was estopped from making arguments regarding adequate economic assurances under § 365(b)(3).

Second, as mentioned before, Equitable tried to strike a deal with Mervyn's to open a Dadeland store as part of a proposed $100 million expansion of the mall. That deal collapsed and litigation over the Jordan Marsh site ensued in earnest when Equitable filed its objection. Equitable resisted any reference to these talks on the theory that these were settlement discussions. This Court found that until litigation commenced formally, these were not settlement discussions and refused Equitable's attempt to exclude the discussions under Rule 408 Fed.R.Evid. Additionally, based on the substance of those talks and the massive, long-term commitments involved, it does not make sense to view those early discussions as anything other than the exploration of a potentially lucrative deal for both parties. (*See*, Ricks Dep. Exh. 3).

Thus, Equitable is also estopped from arguing that it would be economically detrimental to have Mervyn's *anywhere* at Dadeland.

The final issue identified by the Court is that which arises in § 365(b)(3)(D), i.e., the landlord's right to object to a tenant who will disrupt the tenant mix or balance in a shopping center. Without putting too fine a point on it, the word "mix" implies that issues will focus on the inclusion or exclusion of a store in the array or mix of mall stores. The word "balance" implies issues focusing on the location and relationship of tenants in the mix of mall stores.

This Court finds that, when all the procedural, contractual, equitable, and policy issues are brought into the clear light of day,

this is a case involving tenant balance, or, as is said in real estate parlance, "Location, location, location."

### FINDINGS OF FACT

On the basis of the entire record of testimony, arguments, exhibits and briefs, including post-trial submissions (Docs. 5883, 5884, 5887, 5888) the Court hereby makes the following findings of fact:

1. The primary competing interests at stake in this litigation involve (1) a desire by Mervyn's to experiment with a larger, somewhat grander than customary store as a highly visible flagship leading its entrance into the Florida retailing scene, versus (2) The desire of Equitable to commence a $100 million expansion continuing an up-scale evolution of Dadeland that will feature a full-line, high-quality department store as a replacement for Jordan Marsh, a new anchor pad with Nieman Marcus as the proposed tenant, and numerous other improvements.

There was no factual controversy at trial over the questions of whether the Dadeland expansion plan was *bona fide*. This Court finds it was. In a similar manner, we find there was no serious question that inclusion of Mervyn's at the Jordan Marsh site would have most probably aborted any effort to bring Neiman Marcus to Dadeland at a proposed new anchor site.

2. The sentiment of Dadeland tenants expressing a view, led by Saks Fifth Avenue, is overwhelmingly against Mervyn's occupation of the Jordan Marsh site on the theory that such a move will signal an end to efforts to expand and improve the image of the mall.

3. Mervyn's intends to operate only two-thirds of the three-story, 210,000 square foot Jordan Marsh store leaving dark an entire floor, or 70,000 square feet.

4. Mervyn's caters to the "cost-conscious consumer" as opposed to the fashion-conscious, affluent consumer and carries a narrower, more casual and less expensive range of merchandise than Jordan Marsh.

5. Mervyn's is a newcomer to the Florida retail market with almost no experience as a 140,000 square foot anchor in a super-regional mall. The one prior similar experiment with a larger Mervyn's store at Prestonwood Mall in Dallas has performed poorly in terms of revenues per square foot.

6. The sum of all the statistical evidence regarding past mall development, patterns of cross-shopping, and prospective sales and percentage rents, was underwhelming, unpersuasive and could not contribute to sustaining a burden of proof on any issue regardless of which party had the burden.

For example, Equitable asks this Court to decide that Dadeland is a mall "driven by two engines", i.e., featuring Burdines and Jordan Marsh as anchors driving traffic through the mall. This is imponderable in that the evidence showed Burdines as far and away the dominant revenue source (close to 40% of total mall revenues) and Jordan Marsh, Saks and Penneys all showing revenue percentages well under 10% of total mall revenue. Calling Jordan Marsh and the other stores "engines" under these lopsided circumstances is a matter of relative semantics, not fact or law. Even Equitable's expert witness, Mr. Herring, referred to Dadeland as a "wheel with spokes"—a contradictory metaphor to be sure. Debtors, on the other hand, argue that the very notion of balance is inapposite to Dadeland because the mall has had a rather serendipitous history of growth to date. This theory is also not borne out by the evidence.

As another example, Equitable complained that Mervyn's business would not generate impressive sales at the Jordan Marsh site, but Equitable's witness from neighboring Saks complained that the Mervyn's traffic would be so great that it would cause a shortage of parking spaces for Saks customers. Under the circumstances presented in this case, "balance" becomes a concept reminiscent of an Alexander Calder mobile rather than a classic twin scale of justice. In such a random and delicate balance, the testimony of the tenants and other witnesses on the front lines of retailing, such as Messrs. Quintin and Herring and Ms. Ricks, becomes far more probative than generic information on industry-wide retailing phenomena.

7. On the fundamental question of disruption of tenant mix, however, pursuant to § 365(b)(3)(D), Debtors have not provided sufficient proof that assignment of the Jordan Marsh lease to Mervyn's will not disrupt any tenant balance at Dadeland Mall.

Indeed, the Court finds that a preponderance of the evidence indicates Mervyn's move to the Jordan Marsh site will disrupt the Dadeland tenant balance. Here, the testimony of Equitable's witnesses, especially Mr. Quintin from Saks Fifth Avenue, was compellingly persuasive. Mr. Quintin, for example, spoke of his company's earlier need to vacate two prior malls when Mervyn's entered the scene. Shifts in image and aesthetics translate very quickly into dollars at the higher end of the retail business. Mervyn's entry into Dadeland—at the Jordan Marsh location—would signal a shift in overall focus of the mall contrary to the balance that existed with Jordan Marsh and in exactly the opposite direction as the proposed long-range expansion plan of Equitable.

8. The entrance of Mervyn's into Dadeland at the Jordan Marsh site would cause a substantial diminution in the present value of Dadeland Mall. Part of this diminution in value is the present value of a proposed $100 million capital expenditure to expand and upgrade the image of Dadeland Mall.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2. Debtors, as movants, assumed and legally have the burden of proof in this proceeding.

3. Equitable's payment of $700,000 to assume the Jordan Marsh lease and for other consideration did not operate to estop

Debtors from including Dadeland in its overall Florida Strategy. Section 365(f)(2)(A) expressly provides that the assumption of an unexpired lease or executory contract is a necessary precedent to its assignment. Further, the case of *In re Bricker Systems, Inc.*, 44 B.R. 952 (Bankr. E.D.Wis.1984) lends clear support to the proposition that an assumed contract may be assigned at a later date. To be blunt, this Court could, would and should have approved an assignment of the Dadeland Mall Jordan Marsh lease to a clearly suitable tenant had one won the auction bidding. Landlord rights were simply reserved and ultimately protected in the Florida Strategy framework.

4. Nothing in the Jordan Marsh lease or related lease covenants of any other Dadeland Mall leases barred Debtors from including the Jordan Marsh lease in the Florida Strategy proceedings. These covenants are in most instances narrowly drawn (i.e., to exclude a grocery store) and, weak (i.e., no square foot requirement) so as to render them legally ineffectual as a bar to the assignment here. These covenants were negotiated decades ago, and were never a subject of continuing material negotiation or litigation. Now Equitable asks this Court to weave meaning out of whole cloth into these covenants which, quite frankly, never meant very much between friends. We decline to do this. This Court also rejects Equitable's arguments under the anti-assignment provisions of the lease *in toto* for the reasons argued by Debtors and along the same general principles articulated by this Court in another Florida Strategy matter involving JMB Realty (*see*, Doc. 6070).

■ 5. The inclusion of Mervyn's at the present Dadeland Jordan Marsh site will disrupt the tenant balance of the mall as those terms were envisioned by Congress when it passed 11 U.S.C. § 365(b)(3). Section 365(b)(3) was designed to protect landlords and their tenants from the damage caused by bankrupt tenants. The damage of the assignment proposed in this case will occur not so much from an immediate impact on the Dadeland's net operating income or capitalization rate, but rather from a dramatic and negative change in direction of this "going concern." Debtors' insistence that the Court focus on the present rather than future belies the reality that any analysis of a going concern must take into account the present value of the *direction* in which the concern is going. The strength of Equitable's legal (and equitable) position lies not in the benefits of its old bargains with Jordan Marsh, but rather in the benefits of the value of control over the direction of the evolution of Dadeland Mall.

6. Just as the sparse case law in this area suggests, this Court may not imply non-bargained for terms in leases. (*See*, e.g., *In re Ames Department Stores*, 127 B.R. 744 (Bankr.S.D.N.Y.1991); *In re Ames Department Stores*, 121 B.R. 160 (Bankr.S.D.N.Y.1990); *In re TSW Stores of Nanuet, Inc.*, 34 B.R. 299 (Bankr.S.D.N.Y. 1983); *In re Lafayette Radio Electronics*, 12 B.R. 302 (Bankr.E.D.N.Y.1981)). By the same token, so also must we not ignore the reasonable expectations of security and control over the character of future development that Equitable once bargained for with the Debtor under Court supervision. The concept of the "benefit of a bargain" is not a static concept constrained by the four corners of a lease—especially in a case such as this involving continuous, fluid negotiations. This bankruptcy proceeding first provided Equitable with security to plan for the future, then took it away. Based on the reasonable expectations of the parties under all the circumstances, it is fair and just to give a measure of that lost security back to Equitable.

7. The following statement contained in the Congressional Record focuses on the rights and business expectations that are at play when a shopping center landlord is about to be saddled with an unattractive tenant by the bankruptcy process.

In a real sense a shopping center is akin to a small town.... you put down business roots in a town if you believe you will fit in, you believe the town will provide security and other necessary services, and you believe the town will flour-

ish, and your business with it. If the major businesses or other institutions that draw people to town shut their doors, the town will die. If the town's financial base shrinks, the security and other communal services will shrink, and with it will shrink the desirability of the town as a place to visit. If the neighbors with whom you are comfortable leave town, you will soon begin to look elsewhere.

Tenants locate in shopping centers based on the complimentary ability of the various stores in the shopping center to draw customers.... When Saks Fifth Avenue moves out as an anchor store and John's Bargain moves in the small independent fashion boutiques die. When the future of the center is in doubt, a businessman-tenant does not know how to order for the next season.

The matter becomes far more crucial when the chapter 11 debtor is an "anchor store".... Those anchor stores have been looked to as primary draws of clientele to the entire shopping center. The smaller tenants in the shopping center had generally determined to locate in that center based upon the nature of the anchor store.... A shoe store or fashion boutique depends upon the advertising and continued operation of the Saks or Marshall Fields department store (or some prompt substitute) for its continued viability.

Consider a shopping center such as the Water Tower Shopping Center in Chicago, Illinois, which has as its anchor stores a Marshall Fields Department Store and a Lord & Taylor Department Store. The character of that shopping center is established by those stores as a "high-end" shopping center, attractive to smaller boutiques, relatively expensive men's clothing stores, fashion shoe stores and similar uses. Depending on the character of the anchor stores, the other tenants have entered into long-term leases. Consider what happens if one or both of those anchor stores filed chapter 11 proceedings, and the leases are assigned to John's Bargain Basement and J.C. Penney or Sears. This is not to suggest that the latter are not fine department store tenants. It is to make clear that they are department stores with a dramatically different appeal than Lord & Taylor or Marshall Fields [that could be potentially very damaging upon the shopping center].

Bankruptcy Reform: Hearing Before the Subcommittee on Courts of the Senate Committee on the Judiciary on Shopping Center Tenancy Amendments, 98th Cong., 1st Sess. 381–91 (1983) (Statement of Nathan B. Feinstein)

8. Mr. Feinstein might just as well have added that the nature *and location* of one's neighbors in a shopping center can and does make a world of difference in perceptions and profitability.

9. This case involves preservation of the value of a "super-regional mall" valued at nearly one-quarter billion dollars. The Court is concerned about the impact upon value to the owner and 170 tenants when a full-line anchor tenant of 25 years duration in a three-story 210,000 square foot building attempts to assign its lease to Mervyn's, a newcomer to the market, a limited user of part of this space, and a company embarking on a risky experimental expansion of its usual way of conducting business.

This Court must determine the balance of rights between the parties and measure the risk of Mervyn's impact in this space in this Mall today and in the future. While Debtors would walk away from future commitments with value in their pockets, the risk of Mervyn's adventure in this space in this Mall in the future would fall directly on Equitable and its tenants. Congress never intended under the circumstances of this case that landlords and tenants should bear the kind of risks Debtors and Mervyn's seek to impose on them.

For the foregoing reasons, the Debtors' Motion to assign the Jordan Marsh lease at Dadeland Mall to Mervyn's is DENIED.

### Post Script Regarding Potential Further Proceedings Involving The Dadeland Jordan Marsh Lease.

In the course of post-trial briefing, Equitable continued to assert that its prior

offer of $14 million remained on the table for consideration. (Doc. 5888, p. 6)  If that remains true and if Debtor is still interested in marketing the lease, this Court wishes to inform the parties that it has heard enough evidence regarding the reasonable market value of that lease to most probably obviate the need for further valuation testimony in the context of a motion to approve another sale or assignment of the lease.  Simply stated, the $14 million offer appears reasonable.  Under the circumstances, the $18 million allocation of the lease was also reasonable from Mervyn's perspective.  Thus, a range of reasonableness is created.  If it still suits the parties' business interests, this Court will more than likely approve any Dadeland Mall Jordan Marsh lease transaction with a value of at least $14 million.  Of course, any creditor constituency is entitled to examine any proposal and if necessary demonstrate to the Court why such a value is erroneous.

The Court urges the parties to search for expedited business solutions to the specter of a dark store in such a potentially profitable location.

IT IS SO ORDERED.