**In re PIN OAKS APARTMENTS, Alleged Partnership, Debtor.**

**Bankruptcy No. 80–00076–HP.**

United States Bankruptcy Court,
S. D. Texas,
Houston Division.

Nov. 21, 1980.

David Askanase, Houston, Tex., for Trustee.

Van Oliver, Thompson & Knight, Dallas, Tex., for ICM Realty.

James R. O'Donnell, Butler, Binion, Rice, Cook & Knapp, Houston, Tex., for Robert E. Tesch.

Clark G. Thompson, Houston, Tex., for Pin Oaks Apartments.

## MEMORANDUM OPINION

WILLIAM M. SCHULTZ, Bankruptcy Judge.

The matter before the Court is whether a trustee can assume a lease pursuant to § 365 of the Code and, contemporaneously sublease under § 363, not assign, the property under different contractual terms than those provided in the original lease.

ICM Realty, a real estate investment trust, executed a lease, as landlord, on December 23, 1969, with John W. Jennings, et al, as tenant. On October 1, 1971, Jennings, et al assigned their rights, in, to and under the Lease, to Joe E. Russo and Diversified Building Equities, Inc. (collectively referred to as "Russo"). Russo continued to operate the Pin Oaks Apartments as tenant under the Lease until January 25, 1978, when Russo assigned all its right, title and interest in, to and under the Lease to Chrysalis Financial Corporation, the president of which was Charles Zeller (collectively referred to as "Zeller").

At the time of purchase, Zeller offered to three groups of investors under three different limited partnership offerings, the opportunity to invest in Pin Oaks Apartments, by purchasing either an undivided interest in a condominium conversion or an undivided interest in the apartments as a rental entity. Zeller was successful in attracting approximately 50 investors who contributed approximately $1,300,000.00 for this investment opportunity.

Out of the $1,300,000.00, Zeller paid Russo $100,000.00 in cash and executed a promissory note to Russo in the original principal amount of $450,000.00, with interest payable thereon each month at a nine (9%) percent annual rate (the "Russo Note"). The original one–year term of the Russo Note expired on January 25, 1979.

When the investors discovered in the fall of 1978 that no condominium conversion or outright purchase could take place because ICM Realty owned the land, they called a meeting with Zeller, who then informed them of his inability to acquire title to the land, that he no longer had any of their advanced funds, and that in order to protect and maintain their investment in the apartments they would have to provide an additional $450,000.00 to pay the Russo Note. The investors persuaded Zeller to convey by a "Blanket Conveyance, Bill of Sale and Assignment", dated November 28, 1978, all of his interest in and to the Pin Oaks Apartments to Gordon Mowl and John Sullivan as trustees for the other defrauded investors.

Several times Russo extended the maturity date on the $450,000.00 note for the investors. The last agreement provided for an extension of payment until March 31, 1980, if Mowl and Sullivan reduced the outstanding principal by $25,000.00 on or before December 31, 1979. Because the investors failed to make the $25,000.00 payment in December, 1979, the Russo Note is in default. The investors also defaulted in January 1, 1980 by failing to pay The Travelers Insurance Company the $12,122.59 principal and interest payment, and $3,336.41 tax and insurance escrow fund payment due on its first lien against the land and apartments. They failed to pay ICM Realty its fixed rental lease payment due January 1, 1980, in the amount of $6,875.00, and its percentage rental payment due October 31, 1979, in the amount of $7,245.58. Finally, John Sullivan instituted an involuntary petition against Gordon Mowl and the other investors on or about January 28, 1980. Gordon Mowl later agreed to the proceeding.

In late March and early April, 1980, ICM Realty became concerned over the debtor's continuing failure to make the Travelers' first lien payments, fearing that Travelers would accelerate the debt, ask for refinancing at the then prevailing interest rate of twenty (20%) percent, or attempt to foreclose its lien against the land. As a result,

ICM Realty paid Travelers the sum of $63,336.00 on April 3, 1980. In addition, it remitted another $5,722.95 on April 18, 1980, bringing the total payments to $69,058.95. The debtor then failed to make percentage and fixed rental payments due between January 30, 1980 and July 30, 1980, amounting to $31,946.28.

Mr. Sullivan testified before this Court that neither he, Mr. Gordon nor any of the other investors intended to or had the capacity to make the improvements required to the property at a minimum cost of $258,000.00, to bring current the Travelers' lien and ICM rental payments or to rehabilitate the debtor.

As a result, David Askanase was appointed trustee for the debtor on March 13, 1980 upon a Joint Application for Appointment of Trustee. On July 2, 1980, Mr. Askanase filed an Application for Authority to Sell Property, Assume Ground Lease and to Execute a Sublease in which he proposed to assume the ICM Lease and then, in turn, execute a sublease to Robert E. Tesch. Tesch promised to advance $50,000.00 at closing and to contract with some third party at closing or within a reasonable time thereafter, to make needed repairs to the apartment complex. During the 120–day period following closing, he hoped to substantially complete the improvements and to being current any debt owed to ICM for payments ICM made towards the Travelers' first lien.

Also, at the end of the 120–day period, Tesch promised to bring current ICM Realty on its rental payments, but did not agree to pay any pecuniary losses which ICM might be able to prove for lost rentals due to the debtor's undermaintaining the apartments and, as a result, obtaining less than fair market value rents. Tesch did not collateralize his obligations to make the $258,000.00 of improvements and to bring current ICM Realty and Russo at closing.

Tesch also promised to make a cash payment to the debtor in the principal amount of $65,000.00 and to execute a promissory note in the original principal amount of $430,000.00, due in five years and bearing interest at nine (9%) percent, with the first installment of $25,000.00 being paid one year from the closing date. In addition, he stated but did not guarantee to repay the Russo Note in full within 180 days following closing. Upon closing, Tesch would commence payment of a $15,000.00 quarterly rental obligation as provided under the sublease.

Tesch proposed to rent the apartments from the trustee under a sublease of the ICM Lease which had the following provisions:

(1) The only rental obligations Tesch would make to the trustee would be $60,000.00 per year;

(2) Tesch would have the absolute right to sell, convey, assign or sublease his interest in the land and apartments;

(3) The terms of the sublease would control over any conflicting terms of the ICM Lease;

(4) The apartment rents would be abated in the event of any untenable apartments, regardless of the reason;

(5) Tesch would have no liability for any defaults occurring under either the sublease or the ICM Lease, other than to vacate the premises and turn over ownership to the debtor; and

(6) Tesch would have the right to grant a mortgage on the land and leasehold improvements.

Robert Tesch stated at the hearing before this Court on August 20, 1980, that he would be unwilling to live by the terms of the ICM Lease. Specifically, he testified that he would be unwilling to have the trustee assign the Lease to him and/or that he would not assume the position of the present debtor or the trustee under the terms of the ICM Lease.

Section 365(a) of the Bankruptcy Code provides two basic alternatives for a trustee with respect to an unexpired lease. He may either assume the lease or reject it. The Code is silent with respect to the right to sublease, however, section 365(f) provides the trustee may assign the lease. That subsection renders void any language con-

tained in an unexpired lease, which prohibits, restricts or conditions the assignment of that lease, provided the two conditions of Section 365(f)(2) are first met.

Thus, the clear meaning, intent and purpose of Section 365 is to provide the trustee with three possible courses of action: first, to assume the ICM Lease; second, to reject it; or third, to assume and then assign it to a third party who demonstrates adequate assurance of his ability to perform in accordance with its provisions in the future.

Section 365 represents a significant departure from pre–Code law; it balances the rights of the debtor against those of any party contracting with the debtor. Very significantly, it eliminates or renders void two very important types of provisions which otherwise are enforceable against the debtor. Under Section 365(b)(2), the debtor has the newly created right to assume a lease by curing its defaults, notwithstanding contrary provisions providing for its termination due to the debtor's insolvency, commencement of a proceeding under the Code, or the appointment of or taking possession by a trustee or a custodian of the debtor's assets.

Section 365(f)(1) creates a second modification of a party's contractual rights with the debtor. There, the debtor is granted the rights to assign a lease to a third party who becomes fully liable thereunder, notwithstanding any contrary contractual provisions which restrict, prohibit or condition any such assignment. *See* Section 365(k). To correct any imbalance in favor of the debtor, the Code has granted the contracting party certain rights which prior statutory law did not expressly provide. Most importantly are the rights of a contracting party to require the trustee to cure the defaults under the lease. Not only must the trustee provide adequate assurance of promptly curing any defaults existing under the lease, compensate or provide adequate assurance of promptly compensating the actual pecuniary losses suffered by reason of such defaults, and provide adequate assurance of future performance under such lease, he must also "assume" or agree

to live in accordance with the remaining provisions in the lease.

The modification of a contracting party's rights under Section 365(b)(2) and 365(f)(1) is not to be taken lightly. As both the House and Senate Reports on the new Code state, the remaining rights of the non–debtor party to unexpired leases must be accorded the full benefit of their bargain.

> "The unenforceability of ipso facto or bankruptcy clauses proposed under this Section will require the courts to be sensitive to the rights of the non–debtor party to executory contracts and unexpired leases. If the trustee is to assume a contract or a lease, the Court will have to insure that the trustee's performance under the contract or lease gives the other contracting party the full benefit of his bargain."

*See* U. S. Code Congressional and Administrative News, 95th Congress, Second Session, Senate Report No. 95–989, pages 5787, 5845 and House Report No. 95–595, pages 6304–6305.

If Congress intended to give this Court or the trustee the power to abrogate any contractual rights between a debtor and non–debtor contracting party other than anti–assignment and "ipso facto" clauses, it would have expressly done so. With such a recently enacted statute, the failure to give a trustee any additional rights to modify or ignore provisions in existing leases must be construed to deny those rights to him. *Bardes v. First National Bank*, 178 U.S. 524, 20 S.Ct. 1000, 44 L.Ed. 1175.

The "permissive" language of Section 363(b) permits, but does not require the trustee to sublease property of the debtor. It grants him no authority to ignore existing contractual rights as Section 365(b)(2) and Section 365(f)(2) do in those two limited instances. Judge Stone writing for the Eighth Circuit stated the effect of a lease assumption on the trustee most clearly in *Johnson v. Kuhn*, 95 F.2d 629, 633 (1938), when he said:

> "... It is true that the trustee did have the power (subject to control of the Court) to adopt or reject the lease, but

this power did not affect the continued existence of the lease during such period nor did it change the terms giving a right of entry where had existed in the lessor debtor . . . . The adoption (of the lease) has merely the effect of an assignment by force of law . . . . Under this lease, the lessor had no right to enter to abate a nuisance created by the lessee. The trustees succeeded to no greater right. They could adopt or reject the lease as a whole but could not alter its terms."

Accordingly, this Court must give full meaning to the provisions of the ICM Lease. Included are the following:

Under Section 10.01 of the Lease,

"The Tenant or any one or more of the persons collectively constituting the Tenant shall not . . . (b) sublease the demised land, or any part thereof, or (c) sell, transfer, mortgage, pledge, lease . . . the improvements or the interest of the Tenant in any lease of the improvements or the rentals thereunder, without the prior written consent of the landlord in each instance, and any attempt to do any of such acts without such consent shall be null and void and of no effect."

> \*   \*   \*   \*   \*   \*

"For purposes of this Section 10.01, any agreement, whereby the management or operation of any portion of the demised premises shall be entrusted or otherwise transferred to a third party and which will have the effect of reducing the gross rentals (as defined in subsection (b) of Section 3.01) attributable to such portion shall be deemed to be a lease or license of such portion and shall require the written consent of the landlord."

Under the Lease, the trustee is clearly without authority to sublease the apartments to Robert Tesch without ICM's prior written consent. Further, no provision under Section 365 provides the trustee with authority to sublease the apartments. Section 365(c) is expressly limited to allowing a trustee to assign a lease whether or not the lease prohibits or restricts assignment. There is no language in the statute permitting subleasing whether or not the lease contains a prohibition against subleasing.

Subparagraph (b) of the proposed sublease gives Robert Tesch, his successors and assigns, the full and unilateral authority to sell, convey, and assign the sublease. This contravenes Section 10.01(c) of the Lease, as mentioned above. Furthermore, it contravenes Section 10.04 providing:

"Section 10.04. Any consent by the Landlord herein contained or hereafter given to any act of assignment, mortgage, pledge or encumbrance shall be held to apply only to the specific transaction hereby or thereby approved. Such consent shall not be construed as a waiver of the duty of the tenant, or its successors or assigns, to obtain from the Landlord a consent to any other or subsequent assignment, mortgage or encumbrance or the modification of limitation of the right of the Landlord with respect to the foregoing covenant by the Tenant."

Subparagraph (d) of the sublease provides that in the event any of the apartments become untenable for any reason, all rents shall be abated in proportion to the percentage of the total apartments. The fixed and percentage rental requirements under Article 3 of the Lease provide for no such abatement and Section 8.04 expressly states that there shall be no abatement

"Section 8.04. In no event shall the Tenant be entitled to any abatement, allowance, reduction or suspension of rent because part or all of the Demised Premises shall be untenantable owing to the partial or total destruction thereof, anything contained herein to the contrary, no such damage or destruction shall affect in any way the obligation of the Tenant to pay the rent, additional rent or other charges herein reserved or required to be paid, nor release the Tenant of or from any obligation imposed upon the Tenant under this Lease."

The sublease eliminates entirely the percentage rental requirements of Section 3.01(b) of the Lease. In its place, the sublease substitutes a fixed annual rental obligation of $60,000.00 destroying the percent-

age rental benefit ICM Realty expects to receive due to increased "gross rentals" caused by inflation over the remaining 28 years of the Lease's primary term, and its two renewable periods of 15 years each.

"Section 3.01(b). Additional rents (herein after sometimes referred to as the Percentage Rental") equal to 35% of the amount by which the Gross Rentals from the Demised Premises for each Lease Year, or fraction thereof, falling within the terms of this Lease shall exceed the Percentage Rental Base (as hereinafter defined) or an appropriate percentage thereof if the period in question shall more or less than full Lease Year. As used herein, the term "Percentage Rental Base" shall mean $340,000.00."

\*     \*     \*     \*     \*     \*

"The term "Gross Rentals" as used in subsection (b) of this section shall include:

(i) All rentals and other sums or consideration actually received (as determined on the cash and not an accrual basis) by or for the account of the Tenant or any subsidiary or affiliate of the Tenant from subtenants or other persons for or in respect to any use or occupation of the Demised Premises or any part thereof (whether pursuant to Lease, concession, license, franchise or otherwise) . . ."

\*     \*     \*     \*     \*     \*

"Section 2.01(k). The term "Subtenant" shall mean any tenant, subtenant, licensee or other occupant of space in the Demised Premises (other than the Tenant); and the term "Sublease" shall mean any lease, sublease or other agreement for use or occupancy of any such space."

By amendment dated January 1, 1977, Section 3.11 was amended as follows:

"Section 3.11. The Percentage Rental Base is set forth in Section 3.01(b) shall be adjusted in each Lease Year beginning with the current Lease Year by increasing or decreasing the same, as the case may be by an amount equal to the amount by which the utility costs as hereinafter defined, exceed or fall below $55,-000.00."

When read together, these provisions demonstrate the clear meaning of the Lease to preserve in any situation the benefit to ICM Realty of the Percentage Rents. This would include ICM's receiving its percentage rent share of all rents received by the debtor from Tesch, as Subtenant, and from the apartment dwellers, as Subtenants.

Under Section 2.1(e) of the Tesch proposal, the debtor is granted a mortgage on the land and leasehold improvements, contrary to the prohibition against any Tenant's encumbering the leasehold without ICM's prior consent. *See* Section 10.01.

The predecessor of Section 365, Section 70(b) of the Bankruptcy Act of 1898, as amended, provided that "the trustee shall assume or reject an executory contract, including an unexpired lease of real property . . ." The assumption by the trustee of the ICM Lease poses the question of what effect that assumption has. *Collier on Bankruptcy*, 14 Ed. § 70.43(9) states that "the trustee's assumption of an executory contract operates as a complete transfer of all the Bankrupt's contractual rights and contractual liabilities therein." The United States Supreme Court in *Hurley v. Atcheson, Topeka & Santa Fe Ry.*, 213 U.S. 126, 29 S.Ct. 466, 53 L.Ed. 729 (1909), recognized that a trustee can only assume an executory contract by accepting the burdens of that contract as well as its benefits. The Third Circuit concluded in *In re Italian Cook Oil Corp.*, 190 F.2d 994, 996–997 (1951) that:

"... A trustee is, of course, under no obligation to complete executory contracts of a debtor. By Section 70, sub. b of the Act, the Trustee is given the right to adopt or reject an executory contract. He must do one or the other. If the trustee deems the contract to possess no equity or benefit for the estate he rejects it as burdensome. If, on the other hand, he concludes that the executory contract does have an equity for the estate he adopts it. These principles of law have become too well established to permit of doubt. *Atcheson, Topeka & Santa Fe Ry. v. Hurley*, 8 Cir., 153 F. 503, affirmed [213] U.S. 126 [29 S.Ct. 466, 53 L.Ed. 729].

The trustee, however, may not blow hot and cold. If he accepts the contract, he accepts it *cum onere*. If he receives the benefits, he must adopt the burdens. He cannot accept one and reject the other."

The Eighth Circuit *In the Matter of Steelship Corporation*, 576 F.2d 128, 132 (1978), recognized this general rule, stating:

"One purpose of this section [70(b)] is to allow the trustee an opportunity to determine which of the bankrupt's contracts are beneficial to the estate and on that basis make an election whether to assume or to reject them. A parallel purpose is to clarify the effect of an assumption of liabilities by the trustee. It is well settled that the trustee cannot accept the benefits of an executory contract without assuming its burdens as well. *See, e. g., Schokbeton Industries, Inc. v. Schokbeton Products Corp.*, 466 F.2d 171, 175 (5th Cir. 1972). Thus, assumption of a contract by the trustee constitutes an "assumption by the estate of the bankrupt's liabilities, not as a matter of granting a distributive share, but by performance in full, just as if bankruptcy had not intervened. 4A *Collier on Bankruptcy*, ¶ 70.43[2], at 544 (14th Ed. 1975)."

The Fifth Circuit has also addressed the issue in *Schokbeton Industries, Inc. v. Schokbeton Products Corp.*, 466 F.2d 171 (5th Cir. 1972). In connection with Section 70(b), the Court cited the *Hurley v. Atcheson, Topeka & Santa Fe Ry.* and *Italian Cook Oil* cases in its agreement with "the universally recognized rule that a trustee cannot accept the benefits of an executory contract without accepting the burdens as well." *Id.* at 175. The rationale of the Fifth Circuit was approved recently in *Good Hope Refineries, Inc. v. Benavides*, 602 F.2d 998 (1st Cir. 1979) in which the First Circuit decided under Texas law that a lease for oil and gas minerals had terminated automatically upon failure by the debtor to promptly pay delay rentals. The Court stated:

"The Schokbeton Court pointed out that when a trustee exercises his powers under Section 70(b), 11 U.S.C. § 110(b) to assume an executory contract, the trustee

obtains only such contractual rights as the debtor had and assumes all burdens to which the debtor was subject."

General principles of law in connection with executory contracts in bankruptcy proceedings require a trustee assuming a lease to assume all the terms and conditions therein. If Robert Tesch is unwilling to accept the ICM Lease "as is" or "cum onere" by assignment under Section 365(f) then he cannot circumvent its provisions through a sublease which neither Sections 365, 363 nor other applicable law authorizes.

As an additional reason for an assumption and subletting, the trustee strongly urges equitable grounds, primarily that ICM Realty receives a windfall if the lease is cancelled.

In *Queens Boulevard Wine and Liquor Corp. v. Blum*, 503 F.2d 202 (1974), the Second Circuit refused to enforce a commercial lease provision which authorized the landlord to terminate the lease in the event its tenant filed a petition for an arrangement under Chapter XI of the Bankruptcy Act.

In that case, the debtor, Queens Boulevard Wine and Liquor Corporation, owned and operated a retail liquor store pursuant to a 7 year lease dated April 28, 1970. Article 16(b) of the lease provided:

". . . if at any time during the term hereby demised, . . . tenant [shall] make an assignment for the benefit of creditors or petition for or enter into an arrangement, this lease, at the option of the landlord, exercised within the reasonable time after notice of happening of any one or more of such events, may be cancelled and terminated." *Id.* at 203, fn. 1

That clause permitted the landlord to terminate the lease within a reasonable period after institution of the bankruptcy proceedings by or against its tenant, depending upon the landlord exercising its option. Article 63 of the lease provided that notwithstanding contrary provisions of Article 16:

". . . in the event no relief was requested in any bankruptcy proceeding to disaffirm this lease, or to reform the same, and provided, further, that all rent, addi-

tional rent, and other charges due from tenant under this lease are paid promptly when due, ... this lease shall continue in full force and effect." *Id.* at 203, fn. 2

On March 22, 1972, Queens had failed to pay one month's rent, due on March 1. Queens filed a petition for an arrangement under Chapter XI of the Bankruptcy Act on that same day. On April 4, 1972, Queens offered to pay all rent then due subject to obtaining a surety bond which its creditors required in order to stay its adjudication as a bankrupt. The landlord agreed. Thereafter, the landlord received an offer to lease the store at a higher rent and on April 21, 1980, served notice on Queens that the lease would be terminated. Queens remained in possession and as a result of an infusion of outside capital was operating at $2,000.00 per week profit at the time the Circuit Court considered the matter. It was also current on all of its rental obligations and had generated over $50,000.00 for the payment of its unsecured debts.

Based upon these facts, the Second Circuit Court of Appeals exercised its equity powers and determined that the landlord was not justified and should be prevented from exercising its option right under article 16b of the lease, to terminate and evict Queens.

In *Queens Boulevard* the court refused enforcement of a commercial lease provision. However, neither the rationale, facts nor issues presented in that case apply to this proceeding. This Court is not presented with ICM Realty's attempting to exercise its rights to terminate the instant Lease under a bankruptcy or "ipso facto" clause, clauses which Section 365(b)(2) now makes inoperable. ICM Realty is interested in having the Lease defaults cured and in having the terms, provisions and conditions of the Lease abided by in the future.

*In re Overmyer Company, Inc.*, 510 F.2d 329 (2d Cir. 1975) limited the *Queens Boulevard* holding:

"Extending the holding in *Smith* [*v. Hoboken R. R., Warehouse and S. S. Connecting Co.*, 328 U.S. 123, 66 S.Ct. 947, 90 L.Ed. 1123], we held in *Queens Boulevard*

that a bankruptcy court may exercise its equitable discretion to deny enforcement of a termination clause when continuation of the lease would not jeopardize the landlord and termination of the lease would render an otherwise promising arrangement under Chapter XI impossible."

\*　\*　\*　\*　\*　\*

"The facts in this case are strikingly different from those in *Queens Boulevard.* The lower court found that Overmyer's conduct toward the landlords do not justify granting it equitable relief from the terms of its lease. While the debtor in *Queens Boulevard* was only one month behind in rent payments and the landlord was protected by a security deposit, Overmyer had consistently been behind in its payment of its rent, mortgage and tax obligations and the landlords have frequently been forced to borrow money to make those payments."

The equitable considerations which promptly the *Queens Boulevard* court to ignore the lease provision are also not present in this case. The Tesch proposal does not present a continuation of the Lease that would not jeopardize the landlord. Most drastically, the Tesch sublease destroys the percentage rental clause in Section 3.01 of the ICM Lease. Elimination of this clause would prejudice ICM as gross rentals increase over the years because of inflation. For example, ICM approximates their percentage rent for 1981 as $25,900.00. This represents thirty–five (35%) percent of the amount of gross rentals received from the apartments in excess of $340,000.00. This figure is also based on the 1977 amendment to the Lease which increases the percentage rental base of $340,000.00 in any year to the extent any utility bills exceed $55,000.00. Section 3.10 also allows for an upward adjustment of the base to the extent taxes exceed those paid in the base tax year of $29,000.00. If the gross rentals for this year equal $450,000.00, and the utilities and taxes total $120,000.00 that would cause an adjustment upward of the percentage rental base of $36,000.00 [the difference between $120,000.00 and $84,000.00, the sum

of $29,000.00 (tax base) and $55,000.00 (utilities bases)] to $376,000.00. The difference between the $450,000.00 gross rentals and the adjusted percentage rental base of $376,000.00, times the thirty–five (35%) percent factor yields $25,900.00 in percentage rent. Rubert Maxberry on behalf of Tesch Properties testified that after repairs, the apartments would project $57,000.00 per month in rent. Using the same utility and tax bases discussed the gross rentals would approximate $675,000.00. The thirty–five (35%) percent rental factor applied to $99,000.00 (the difference between the adjusted percentage rental base and the gross rentals) would yield ICM $104,650.00 percentage rental.

As inflation causes utility costs, taxes and rents to increase, the gross rentals and the adjusted percentage rental base will increase, resulting in greater amounts of percentage rent for ICM. The Tesch sublease would abrogate the percentage rental and replace it with $60,000.00 fixed rent.

The debtor and trustee argue that enforcement of the percentage rental clause is inequitable because it results in ICM receiving increased rentals greatly out of proportion to what it originally bargained for, due to changing economic climate and high rate of inflation. This, in turn, makes it impossible for the tenant to pay the fixed rental fee, operating expenses, the percentage rental fee, and make necessary improvements. The property would be, if not already is, economically impossible to operate. It would also be impossible for the debtor to complete a successful reorganization under Chapter 11, making enforcement of the provision even more inequitable.

It would be dangerous precedent, however, for this Court to be in the business of reforming contracts and leases because of changing economic conditions. Depending on the peaks and valleys of our economic circumstances, the courts would be considering in every case whether a contract was equitable or inequitable. In three years, ten years, the other party could return to court arguing that the contract required reformation again. The battle could continue during the entire life of the contract. It was not the intent of Congress for the courts to interfere so drastically in the commercial dealings of parties, negotiated in arms' length transactions. The equities in *Queens Boulevard* are simply not present here. And as already outlined, the Tesch sublease eliminates other important provisions of the ICM Lease, further distinguishing *Queens Boulevard*.

Sections 365 and 363(b) of the Code do not give the trustee the power to assume the ICM Lease and then change its provisions. The trustee is bound by the terms of the Lease. He must assume and adhere to all its' provisions other than "ipso facto" clauses and any restrictions against assignments. The two (2) ICM Lease clauses of particular interest are the subleasing restriction and the percentage rental fee. The trustee is bound not to sublease the apartments without the landlord's consent. ICM does not consent to the Tesch sublease. The Code provides that an assignment by a trustee can be made notwithstanding language in the lease to the contrary or language requiring the lessor's consent. There is no Code provision or case law allowing a sublease despite language to the contrary in the lease. The lease provision against subleasing is enforceable under Texas law as well as under the Bankruptcy Code. Tex. Rev.Civ.Stat.Ann. Art. 5237 provides:

"A person renting said lands or tenaments shall not rent or lease the same during the term of said lease to any other person without first obtaining the consent of his landlord, his agent or attorney."

Texas case law provides that without the consent of the landlord to the subletting, the sub–tenant is a trespasser and occupies the position of a stranger to the landlord. *Young v. De La Garza*, 368 S.W.2d 667 (Tex.Civ.App.–Dallas 1963); *Digby v. Hatley*, 574 S.W.2d 186 (Tex.Civ.App.–San Antonio 1978).

The trustee is also bound by the percentage rental clause of the sublease. He cannot contravene that provision by subleasing to Tesch pursuant to a different rental fee

agreement. If the trustee proposed an assignment of the Lease to Tesch instead of a sublease, the assignment would necessarily include the percentage rental provisions. By subleasing, the trustee cannot accomplish what he could not accomplish by an assignment.

For the above reasons, the trustee's application to assume the Lease is denied. An Order has been entered.