In re TSW STORES OF NANUET, INC., Debtor.

ROCKLAND CENTER ASSOCIATES, Plaintiff,

v.

TSW STORES OF NANUET, INC., Debtor in Possession, Defendant.

Bankruptcy No. 83 B 20216.
83 ADV. 6138.

United States Bankruptcy Court, S.D. New York.

Nov. 4, 1983.

Chester B. Salomon, P.C., New York City, for Rockland Center Associates.

Levin & Weintraub & Crames, New York City, for debtor.

Skadden, Arps, Slate, Meagher & Flom, New York City, for intervenor Save-A-Lot.

### DECISION ON MOTION FOR AUTHORIZATION TO ASSUME AND ASSIGN LEASE

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The debtor TSW Stores of Nanuet, Inc. ("TSW"), as debtor in possession in this Chapter 11 case, moved pursuant to Bankruptcy Code § 365(a) and (f) and Bankruptcy Rule 6006(a) for authorization to assume and assign its lease in the Rockland County Shopping Center to Odd Lot Trading, Inc. ("Odd Lot"). The landlord, Rockland Center Associates, ("landlord") and an intervenor tenant, Save-A-Lot, Inc. ("Save-A-Lot") objected to the debtor's motion. At the end of TSW's direct case, the landlord and Save-A-Lot moved for dismissal under Fed.R. Civ.P. (41)(b), made applicable by Bankruptcy Rules 7041 and 9014, on the ground that the debtor failed to prove a *prima facie* case. Decision was reserved. The landlord and Save-A-Lot then put in their evidence, after which they renewed their motions to dismiss.

The debtor concedes that its application to assume and assign the lease carries with it a requirement that the lease be modified to expand an existing use clause to include, in addition to the items presently permitted to be sold by TSW, all those items of general merchandise typically sold by Odd Lot in its close-out business now conducted by its approximately sixty retail stores throughout the country.

### FINDINGS OF FACT

1. On April 27, 1983, TSW filed with this court a petition for relief under Chapter 11 of the Bankruptcy Code and has since conducted its business as a debtor in possession pursuant to Code § 1108. The debtor is a wholly owned subsidiary of Toy & Sports Warehouse, Inc. The parent corporation filed with this court its own Chapter 11 petition on March 22, 1983. The debtors previously operated ten retail discount toy stores in New York and New Jersey. They were authorized by order of this court, dated May 23, 1983 and July 5, 1983 to close operations at the stores located in Yonkers, Bronxville, and Riverdale, New York and to transfer the inventory to the other operating stores. The debtor is presently attempting to market its leases, including the lease in the Rockland County Shopping Center, which is situated on Route 59 in Nanuet, New York.

2. The landlord is a New York general partnership, the general partners of which are Rockland Center Investors and Pelham Rock Investors, both New York partnerships. The landlord owns the Nanuet Shopping Center.

3. Pursuant to a lease dated November 6, 1979, the debtor leased approximately 14,687 square feet within the shopping center from the former owner, Korvettes, Inc., for a period to expire in 1989, subject to certain renewal options.

4. Under the debtor's lease, a minimum fixed rental is provided so long as an 80,000 square feet department store was operating in the shopping center. In addition, the lease provides for a percentage rental of two percent of the debtor's gross sales in excess of certain sales volume. Since 1982, when the landlord acquired the property from Korvettes, Inc., there has not been any 80,000 square feet department store operating in the shopping center so that the debtor's rent was based upon two percent of its gross sales under the percentage rental clause. The landlord has alleged that the debtor's rental payments under the percentage clause has resulted in monthly rental payments averaging less than $350 per month. Moreover, the landlord alleges that the debtor has not conducted its business in the leased premises in such manner as will achieve maximum volume, as required under the lease.

5. The intervenor, Save-A-Lot, operates a general merchandise store in approximately 18,250 square feet of leased space in the same shopping center in Nanuet where

the debtor is located. The Save-A-Lot lease commenced on March 10, 1983 and continues for fifteen years. It provides for a fixed annual rent of $142,840, which escalates upwards at designated increments to $282,812 for the fifteenth year. Save-A-Lot currently pays approximately $14,500 per month for rent, common charges and taxes.

6. A restrictive use clause in the debtor's lease provides that the debtor shall use the premises solely for the retail sale of:

toys, sporting goods, hobbies, wheel goods and juvenile furniture, with the incidental right, in not over ten percent (10%) of the sales floor area, for the retail sale of health and beauty aids, stationery, candy and tobacco items, and for no other purpose.

7. The Save-A-Lot lease also contains a restrictive use clause which limits the business: "solely for the purpose of conducting the retail business of the sale of general merchandise . . . . " Additionally, the Save-A-Lot lease specifically prohibits Save-A-Lot from using the premises for any of the following uses:

For the retail or wholesale sale of perishable foods, including but not limited to, fresh meat, fresh produce, frozen foods, fresh dairy products, alcoholic beverages, raw lumber, paneling, cement (in more than 5-pound bags), floor and ceiling tiles, windows, doors, bulk insulation, full-size major appliances, sale of greeting cards from display racks, magazines and newspapers. In no event shall Tenant use more than twenty (20%) percent of the total floor sales area for the sale of non-perishable food (including pet food).

8. The debtor currently operates in compliance with the use clause in its lease and sells toys, stationery, sporting goods for children, juvenile furniture, bicycles, and some health and beauty aids.

9. The Save-A-Lot premises is divided into approximately 9,500 square feet for retail space, and the balance is used for warehousing and offices. Save-A-Lot's business is the sale of general merchandise on a close-out basis. This means that it sells discontinued items, factory overruns and distressed merchandise, usually for less than the wholesale price, as distinguished from current items that a discount store might sell for less than the full retail price. Save-A-Lot's merchandise consists primarily of giftwares, housewares, health and beauty aids and some toys. It also sells some hardware items. The merchandise is displayed on shelves and fixtures in the store, with some of the merchandise stacked in the original cartons with the front of the cartons cut open.

10. The proposed assignee, Odd Lot, is in the same business as Save-A-Lot. It sells close-out merchandise which is usually a year or two old, or current damaged or rejected merchandise. It generally carries only "hard goods" such as housewares, gifts, toys, hardware and health and beauty aids. It uses shelving and free standing metal gondolas to merchandise its wares as well as rows of wooden structures on the store floor on which merchandise is stacked. There is no specific product mix because it is not known from week to week what type of merchandise will be acquired for sale on a close-out basis. While there may be a difference as to specific items, Odd Lot and Save-A-Lot sell the same categories of products.

11. As part of the debtor's application to assign the Rockland Shopping Center lease to Odd Lot, the debtor requests the court to expand the use clause to include all items as may be typically sold by Odd Lot in its various close-out stores. The proposed language reads as follows:

(a) The Premises shall be used for the following purposes:

"Retail sale of close-out or general merchandise at discount including but not limited to the sale of toys, sundries, sporting goods, hobbies, wheel goods, juvenile furniture, health and beauty aids (including non-prescription drugs), stationery, candy and other packaged food items and *such other items as may be typically sold in an Odd Lot Trading, Inc. store.*"

(b) The order which approves the assumption of the Lease by TSW Nanuet

and its assignment to Odd Lot shall contain a provision restraining the Landlord from in any way interfering with the operations of Odd Lot and its use of the Premises, provided that Odd Lot fulfills the terms and provisions of the Lease as may be modified by the order approving the assumption and assignment of the Lease.

See Debtor's Application for Assumption and Assignment at 3 (emphasis added).

12. The Rockland Shopping Center contains approximately 250,000 square feet. Having previously lost the largest anchor store, Korvettes, Inc., the present landlord divided the space between two smaller stores, Pathmark, a food store, and Service Merchandise, a catalogue store selling general merchandise by catalogue. Other tenants in the shopping center are the debtor (toy store), Save-A-Lot (general merchandise close-outs), Channel Lumber (home improvements), Hair Affair Hair Cutters (unisex haircutting), Coriano's (women's beauty salon), Household Finance Co. (money lending), Jack LaLanne Health Spa (health spa), McDonald's (fast food), Appliance City (major appliances), Hess (gas station) and a dry cleaners.

13. Additionally, the landlord has leased space at the shopping center to the following new tenants: Kids-R-Us (children's clothing), Pickwick Village (card shop), Save-on-Sneaks (running shoe store), Factory Warehouse Clothing Store (men's, women's and children's clothing), a bank, an Italian restaurant, a Chinese restaurant and a photo processing store.

14. The leases with the tenants in the Rockland Shopping Center contain affirmative and negative covenants with the intention of protecting the tenants from competing with one another in their primary lines of business, although there may be an overlapping of certain products. Thus, in addition to the debtor, toys might be purchased at Pathmark, Save-A-Lot and Service Merchandise. Household items might be purchased at Pathmark, Channel Lumber and Save-A-Lot.

15. Odd Lot admittedly would not assume the debtor's lease as it now reads. For Odd-Lot to be willing to assume the lease, it would require a modification of the restrictive use clause so as to expand the permitted range of merchandise to include "such other items as may be typically sold in an Odd Lot Trading, Inc. store." Both the landlord and Save-A-Lot object to such expansion because it would undercut their economic interests by substantially disrupting the tenant mix.

16. Tenant mix is an objective of a shopping center landlord. As stated by one expert at the trial:

It means developing a variety of uses in the shopping center which would attract as many customers into the shopping center, in order that there be an opportunity for all the stores in the center to participate in the customers that come.

Transcript of October 11, 1983 at 107.

Another expert also said:

Generally, we will try to put tenants in that try to compliment [sic] each other. We will try to place these tenants in such a way that somebody will shop the center, not shop one store and run home.

Transcript of October 5, 1983 at 143.

17. The landlord's representative testified that when the present landlord purchased the shopping center it "was made up primarily of hard goods stores and it was made primarily of your, say impulse, convenience type sales, services." Id. at 144. He then went on to say that what the landlord tried to do "is to soften that line with soft goods, clothing, and to expand on it as well." Id.

18. The evidence at the trial established that if Odd Lot entered the shopping center with its full line of general merchandise, there would be a reduction in Save-A-Lot's earnings because both stores would be in direct competition for the same potential customers in the shopping center.

19. The evidence also established that Odd Lot's presence in the shopping center would not attract any more customers than now shop the center. The landlord would

suffer because lenders would be less likely to refinance the shopping center due to the duplication in use by Odd Lot and Save-A-Lot. This duplication would also diminish the value of the center if it were sold.

20. The common theme applicable to the stores in the Rockland Shopping Center is the sale of merchandise at a discount. As earlier noted, there is a distinction between a discount store and a close-out store. Discounters sell current merchandise at prices below the general retail level. However, close-out stores sell goods that are not current, perhaps two years old, as well as discontinued items, factory overruns and distressed merchandise. These types of items are generally not offered for sale by retailers or discount stores in their regular line of goods.

However, none of the witnesses, including the employees of parties in this action as well as the independent experts, could cite a single instance where two stores selling general merchandise at close-out existed in the same shopping center. Indeed, the suppliers would not sell close-out merchandise to two competing stores in the same shopping center, with the result that a small, single store operation, like Save-A-Lot, would be frozen out by a large chain, such as Odd Lot.

21. Obviously, this landlord prefers to retain Save-A-Lot as a tenant because the lease with Save-A-Lot would return a much higher rental than the two percent of gross sales formula contained in the debtor's lease that Odd Lot desires to assume. It appears that even with Odd Lot's increased volume, and thus, higher rent payments than those now made by the debtor, the landlord would still receive more rent under the Save-A-Lot lease. With a lower rent cost, Odd Lot would be in a better competitive position to drive Save-A-Lot out of business, and the landlord would also suffer. Not only would the landlord lose a valuable tenant, but it appears there would be difficulty in finding a new tenant for Save-A-Lot's store. The Save-A-Lot store is more than enough to handle all the people in the Nanuet area who want to shop that store. Also it is too

deep and its configuration is not of the type that would readily attract another tenant.

22. The evidence reveals that a good tenant mix in a shopping center benefits the landlord and the tenants as well. In some categories, duplication is desirable. Competition among women's apparel and shoe stores in shopping centers is salutary because comparison shopping is beneficial for all the competing stores and more potential customers are brought to the center. However, two competing stores selling general merchandise at close-out would not bring in any additional potential customers and would divide up the business between them. The other tenants in the shopping center would not benefit from this situation. Moreover, the existence of two competing stores selling general merchandise at close-out in a suburban shopping center would tend to limit the potential tenants who might be interested in leasing space in such a shopping center because there would be fewer categories of businesses to attract customers to the center.

23. Accordingly, the evidence establishes that an assumption and assignment of the debtor's lease to Odd Lot, based upon the modified restrictive use clause as demanded by Odd Lot, would substantially disrupt the tenant mix in the Rockland Shopping Center to the detriment of the landlord and the other tenants of the center. There was no proof that a single shopping center anywhere in this country has two competing close-out stores selling general merchandise like Save-A-Lot and Odd Lot. Such a division of customers between these duplicating uses is precisely what the landlord tried to avoid by imposing restrictive use clauses in the leases with regard to the tenants' primary lines of merchandise.

## DISCUSSION

This is not a case where the debtor simply desires to invoke the assumption of executory contracts rule contained in 11 U.S.C. § 365(a) and then assign the contract to a third party pursuant to 11 U.S.C. § 365(f), subject to the doctrine of adequate protection. This debtor seeks authority to modify

a shopping center lease so as to expand its terms beyond the limitations of an express restrictive use clause provided in the lease. The landlord and the intervenor tenant, Save-A-Lot, moved to dismiss the debtor's application at the conclusion of the debtor's case because they argue that a bankruptcy court may not authorize such a modification. This court agrees that the debtor has shown no right to relief upon the facts and the law.

## ASSUMPTION DOES NOT MEAN MODIFICATION

■ The motions to dismiss made by the landlord and Save-A-Lot implicate Fed.R. Civ.P. 41(b), which is made applicable by Bankruptcy Rules 7041 and 9014, and provides, in relevant part, as follows:

> After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a). Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision ... operates as an adjudication upon the merits.

A motion to dismiss after the plaintiff's case must be granted when the plaintiff has failed to prove any right to relief. *See Wilson v. United States,* 645 F.2d 728, 730 (9th Cir.1981); *Southern Arizona York Refrigeration Co. v. Bush Manufacturing Co.,* 331 F.2d 1, 5–6 (9th Cir.1964); *Island Service Co. v. Perez,* 309 F.2d 799, 803 (9th Cir.1962); *Huber v. American President Lines,* 240 F.2d 778, 779 (2d Cir.1957); 5 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice ¶ 41.14(3), (4) (2d ed. 1981).

This rule was succinctly stated in *Wilson v. United States* as follows:

> Dismissal under Rule 41(b), in contrast, occurs in a bench trial when the trial judge concludes that the plaintiff has not made out a case. The trial judge in ruling on a Rule 41(b) motion is the factfinder.

645 F.2d at 730.

■ In the instant case, the debtor has not shown that this court may disregard the present restrictive use clause in the debtor's shopping center lease. No authority has been presented allowing a modification of the use clause to permit the sale of various categories of merchandise which the debtor is now forbidden to sell in the shopping center.

■ It is settled law that a trustee or a debtor in possession "takes the contracts of the debtor subject to their terms and conditions. Contracts adopted by him are assumed cum onere." *Thompson v. Texas Mexican Railway Co.,* 328 U.S. 134, 141, 66 S.Ct. 937, 942, 90 L.Ed. 1132 (1946) (footnote omitted). This point is also expressed in Collier on Bankruptcy as follows:

> An executory contract cannot be rejected in part, and assumed in part. The debtor, or the trustee, is not free to retain the favorable features of the contract and reject only the unfavorable ones. *Assumption carries with it all of the burdens* as well as the benefits of the contract. The contract must be rejected in its entirety, or not at all.

8 Collier on Bankruptcy ¶ 3.15[7] at 205–06 (J. Moore 14th ed. 1978) (emphasis added) (footnotes omitted). In the case of *In re Klaber Bros., Inc.,* 173 F.Supp. 83, 85 (S.D. N.Y.1959) District Judge Levet, quoting from Collier, held that an executory contract could not be rejected in part and assumed in part. A recent bankruptcy court, citing *Klaber,* held that a debtor could not reject only the burdensome provisions in an executory partnership agreement. *In re Silver,* 26 B.R. 526, 529 (Bkrtcy.E.D.Pa.1983). Similarly, a debtor may not assume an executory contract and also reject damage provisions contained in

the assumed contract. *In re City Stores Co.,* 21 B.R. 809, 812 (Bkrtcy.S.D.N.Y.1982).

■ There are certain contractual provisions, however, which a bankruptcy court may disregard when authorizing a debtor to assume an executory contract or lease. Code § 365(b)(2) permits a bankruptcy court to ignore so-called *ipso facto* and forfeiture clauses.[1] However, a restrictive use clause in a shopping center lease which is designed to maintain the tenant mix is not in this category. Such a clause is expressly recognized as requiring adequate assurance of performance in the event the debtor wishes to assume the lease, as expressed in 11 U.S.C. § 365(b).

§ 365. Executory contracts and unexpired leases.

.    .    .    .    .

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

.    .    .    .    .

(3) For the purposes of paragraph (1) of this section, adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance—

.    .    .    .    .

(C) that assumption or assignment of such lease will not breach substantially any provision, such as a radius, location, use, or exclusivity provision, in any other lease, financing agreement, or master agreement relating to such shopping center.

This point was emphasized in *In re Pin Oaks Apartments,* 7 B.R. 364 (Bkrtcy.S.D. Tex.1980), where the court did not permit a rewriting of material terms in a lease to the economic detriment of the landlord. The court said:

> If Congress intended to give this Court or the trustee the power to abrogate any contractual rights between a debtor and nondebtor contracting party other than anti-assignment and "ipso facto" clauses, it would have expressly done so. With such a recently enacted statute, the failure to give a trustee any additional rights to modify or ignore provisions in existing leases must be construed to deny those rights to him. *Bardes v. First National Bank,* 178 U.S. 524, 20 S.Ct. 1000, 44 L.Ed. 1175.

7 B.R. at 367. Similarly in *In re LHD Realty Corp.,* 20 B.R. 717 (Bkrtcy.S.D.Ind. 1982), a debtor was not permitted to modify a lease that was assumed under Code § 365.

In the instant case, not only does the debtor wish to modify the restrictive use

---

1. Executory contracts and unexpired leases.

.    .    .    .    .

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides, adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.
(2) Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to—

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title; or

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.
11 U.S.C. § 365(b)(1), (2) (1982).

clause in the lease, but it seeks such modification as a prerequisite to its assigning the lease to a third party, Odd Lot. Pursuant to Code § 365(f)(2), a debtor in possession may assign an unexpired lease of the debtor only if—

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2)(A), (B) (1982). Thus, instead of Odd Lot's furnishing adequate assurance of future performance under the lease, Odd Lot says that it will be able to perform only in accordance with a modified lease. Odd Lot needs a rewritten use clause which will permit it to sell close-out merchandise in categories that are now restricted under the lease and in head to head competition with an existing tenant in the shopping center. Odd Lot concedes that it cannot and will not operate its business under the current restrictive use clause in the debtor's lease.

The debtor relies heavily upon the case of *In re U.L. Radio,* 19 B.R. 537 (Bkrtcy.S.D.N.Y.1982), where the court authorized an assignment of a first floor store lease in a residential apartment building to a bistro where the limited use for the debtor's store provided for television service and the sale of electrical appliances. The court specifically stated that the doctrine of adequate assurance was not violated by a deviation in use in an apartment building whereas a substantial change in use would not be permissible in a shopping center lease. *Id.* at 544; *cf.* S.Rep. No. 989, 95th Cong., 2d Sess. 59 (1978), *reprinted in* 1977 U.S.Code Cong. & Ad News 5787, 5845 (protection of tenant mix provided for in shopping centers but "[p]rotection for tenant mix will not be required in the office building situation"). The court found no evidence of any economic detriment to the landlord and nothing was mentioned as to an effect on the other business tenants in the building. *Id.* at 544–45. The situation is otherwise in the instant case. The modification sought by the debtor as a prerequisite to the assumption and assignment of its lease to Odd Lot amounts to a substantial rewriting of the restrictive use clause. Such a modification of the use clause would operate to the economic detriment of the landlord and the other tenants in the shopping center, and especially to the continued survival of Save-A-Lot.

In light of the foregoing, it is concluded that the debtor's *prima facie* case palpably does not satisfy the requirements of Code § 365(f)(2)(B) and must be dismissed.

## SUBSTANTIAL DISRUPTION OF TENANT MIX

■ Even if it were decided that the debtor did make out a *prima facie* case to withstand a motion to dismiss, the rebutting evidence establishes that the debtor's assignment of the lease with the requested modification would substantially disrupt the shopping center's tenant mix.

When dealing in the context of non-shopping center businesses, the courts have permitted deviations in operations where the assignee's conduct would not violate the express terms of the lease. In *In re Peterson's Ltd. Inc.,* 31 B.R. 524 (Bkrtcy.S.D.N.Y. 1983) a change in use was authorized to permit an assignment of a so-called high class tobacco shop to an assignee who sold discounted cigars. In *In re Fifth Avenue Originals,* 32 B.R. 648 (Bkrtcy.S.D.N.Y. 1983), a lease assumption and assignment from a high class boutique selling clothing and accessories for both sexes to Diane von Furstenberg, a designer offering women's clothing and accessories, was approved. In *In re Evelyn Byrnes, Inc.,* 32 B.R. 825 (Bkrtcy.S.D.N.Y.1983) the use clause provided that the tenant shall sell fine women's clothing and related accessories and shall conduct its business in a high grade and reputable manner. The court permitted an assignment of the lease to "Labels For Less," which sold fine women's clothing, but at discount prices. In *In re Brentano's, Inc.,* 29 B.R. 881 (Bkrtcy.S.D.N.Y.

1983), the court permitted the bifurcation of a lease for two floors in a building and authorized the *pro tanto* assignment of the lease for one of the two floors. In these non-shopping center cases the courts took a less stringent view of the concept of adequate assurance of future performance under the leases.

■ The concept of adequate assurance of future performance of shopping center leases includes some additional elements which must be satisfied, as reflected in Code § 365(b)(3). The court must pay heed to radius, location, use, or exclusivity provisions in the other tenants' leases, and must observe the provisions in the master agreement for the shopping center. 11 U.S.C. § 365(b)(3)(C). Additionally, subsection (D) provides:

365. Executory contracts and unexpired leases.

.    .    .    .    .

(D) that assumption or assignment of such lease will not disrupt substantially any tenant mix or balance in such shopping center.

Congress' solicitous attitude toward shopping centers is reflected in the legislative history regarding this section, which states:

A shopping center is often a carefully planned enterprise and though it consists of numerous individual tenants, the center is planned as a single unit, often subject to a master lease or financing agreement. Under these agreements, the tenant mix in a shopping center may be as important to the lessor as the actual promised rental payments, because certain mixes will attract higher patronage of the stores in the center, and thus a higher rental for the landlord from those stores that are subject to a percentage of gross receipts rental agreement. Thus, in order to assure a landlord of his bargained for exchange, the court would have to consider such factors as the nature of the business to be conducted by the trustee or his assignee, whether that business complies with the requirements of any master agreement, whether the kind of business proposed will generate gross sales in an amount such that the percentage rent specified in the lease is substantially the same as what would have been provided by the debtor, and whether the business proposed to be conducted would result in a breach of other clauses in master agreements relating, for example, to tenant mix and location.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 348–49 (1977), *reprinted in* 1977 U.S.Code Cong. & Ad.News 5963, 6305.

The level of competition between stores in a shopping center must be considered, especially in connection with the fact that the success or failure of individual tenants may affect the landlord and the other tenants in the center. *In re Lafayette Radio Electronics Corp.,* 12 B.R. 302, 312 (Bkrtcy. E.D.N.Y.1981).

One of the landlord's expert witnesses testified that "there are really two levels to our [tenant] mix. One is soft goods versus hard goods and one is the pricing of these things . . . ." Transcript of October 5, 1983 at 144. Additionally, other stores offering various goods and services fill the smaller spaces for the mutual benefit of all stores in the shopping center. Hence, although there may exist at the shopping center an overlapping of uses that may be beneficial for all the stores, there is no exact duplication of primary businesses. Manifestly, the landlord has inserted restrictive use clauses in the tenants' leases to avoid a head to head confrontation between two stores selling the exact same categories of merchandise. The debtor's proposed modification for purposes of assumption and assignment of its lease offends the landlord's concept of tenant mix. Such a modification would reduce the categories of businesses that might attract potential customers to the shopping center and would substantially disrupt the existing tenant mix and balance in the shopping center, as proscribed by Code § 365(b)(3)(D). In all likelihood, the intervenor tenant, Save-A-Lot, would be injured and perhaps forced out of business, to the injury of itself, the landlord and the other tenants in the shopping center.

## CONCLUSIONS OF LAW

1. This court may not authorize a modification of the debtor's shopping center lease to expand the restrictive use clause in question to allow the debtor to assume the modified lease and to assign it thereafter to Odd Lot.

2. The proposed assignee, Odd Lot, admittedly will not offer adequate assurance of future performance of the lease as it now reads. This failure of adequate assurance of future performance of the lease, without the proposed modification, fails to comply with Code § 365(f)(2)(B).

3. The debtor has failed to establish a *prima facie* case under Code § 365(f)(2)(B), with the result that its application to assume and assign the shopping center lease in question must be dismissed.

4. Based upon all the evidence in this case, the debtor has failed to establish that the assumption and assignment of its shopping center lease will not disrupt substantially any tenant mix or balance in the shopping center, as required by Code § 365(b)(3)(D). Accordingly, the debtor's application must be dismissed upon the facts and the law.

SUBMIT ORDER on notice.